**THE EUROPEAN COMMUNITY, Acting on its own behalf and on behalf of the Member States it has power to represent, and the Kingdom of Belgium, Republic of Finland, French Republic, Hellenic Republic, Federal Republic of Germany, Italian Republic, Grand Duchy of Luxembourg, Kingdom of the Netherlands, Portuguese Republic, and Kingdom of Spain, Individually, Plaintiffs–Appellants,**

v.

**RJR NABISCO, INC., R.J. Reynolds Tobacco Co., R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco International, Inc., RJR Acquisition Corp., f/k/a Nabisco Group Holdings Corp. and R.J. Reynolds Tobacco Holdings, Inc., Philip Morris International, Inc., Philip Morris Companies, Inc., Philip Morris Incorporated, d/b/a Philip Morris Products, Inc., and Philip Morris Duty Free, Inc., Defendants–Appellees.**

**Department of Amazonas, Department of Antioquia, Department of Atlantico, Department of Bolivar, Department of Caqueta, Department of Casanare, Department of Cesar, Department of Choco, Department of Cordoba, Department of Cundinamarca, Department of Huila, Department of La Guajira, Department of Magdalena, Department of Meta, Department of Narino, Department of Norte De Santander, Department of Putumayo, Department of Quin-**

---

dio, Department of Risaralda, Department of Santader, Department of Sucre, Department of Tolima, Department of Valle Del Cauca, Department of Vaupes and Santa Fe De Bogota, Capital District, Plaintiffs–Appellants,

v.

Philip Morris Companies, Inc., Philip Morris Incorporated, d/b/a Philip Morris Products, Inc., Philip Morris Latin America Sales Corporation, Philip Morris Duty Free, Inc., British American Tobacco (Investments) Ltd., B.A.T. Industries, P.L.C., Brown & Williamson Tobacco Corporation, USA; Batus Tobacco Services, Inc. and British American Tobacco (South America) Ltd., Defendants–Appellees.

The European Community, Acting on its own behalf and on behalf of the Member States it has power to represent, and the Kingdom of Belgium, Republic of Finland, French Republic, Hellenic Republic, Federal Republic of Germany, Italian Republic, Grand Duchy of Luxembourg, Kingdom of the Netherlands, Portuguese Republic, and Kingdom of Spain, Individually, Plaintiffs–Appellants,

v.

Japan Tobacco, Inc., JT International Manufacturing America, Inc., JTI Duty–Free USA, Inc., JT International S.A., Japan Tobacco International U.S.A., Inc. and Premier Brands, Ltd., Defendants–Appellees.

No. 02–7325(L), 02–7330(CON), 02–7323.

United States Court of Appeals, Second Circuit.

Argued: Jan. 29, 2003.
Decided: Jan. 14, 2004.

Kevin A. Malone, Krupnick, Campbell, Malone, Buser, Slama, Hancock, Liberman & McKee, P.A. (Speiser, Krause, Nolan & Granito, New York, NY, on the brief), Fort Lauderdale, FL, for Plaintiffs–Appellants.

Murray R. Garnick, Amold & Porter (Robert Weiner, Anthony J. Franze, Sheila B. Scheuerman, on the brief), Washington, D.C., for Defendants–Appellees Philip Morris Companies Inc., Philip Morris Incorporated, Philip Morris International Inc., Philip Morris Products Inc., Philip Morris Latin America Sales Corporation, and Philip Morris Duty Free Inc.

Ronald S. Rolfe, Cravath, Swaine & Moore LLP (Gary A. Bornstein, on the brief), New York, NY, for Defendants–Appellees British American Tobacco (Investments) Limited, and British American Tobacco (South America) Limited.

David M. Bernick, Kirkland & Ellis LLP (Jonathan C. Bunge, Christopher Turner, on the brief), Chicago, IL, for Defendants–Appellees Brown & Williamson Tobacco Corporation, and BATUS Tobacco Services, Inc.

Mary Elizabeth McGarry, Simpson Thacher .& Bartlett LLP, New York, NY, for Defendant–Appellee B.A.T. Industries P.L.C.

C. Stephen Heard, Jr., Sullivan & Heard LLP (Charles Sullivan, Andrew McNeela, on the brief), New York, NY, for Defendant–Appellee R.J. Reynolds Tobacco International, Inc.

Jeffrey S. Sutton, Jones Day (William T. Plesec, Timothy J. Finn, on the brief), Columbus, OH, for Defendants–Appellees R.J. Reynolds Tobacco Holdings, Inc., R.J. Reynolds Tobacco Company, and RJR Acquisition Corp.

Lawrence Berger, Garden City, NY, for Amicus Curiae Federal Law Enforcement Officers Association.

Stephen P. Younger, Patterson, Belknap, Webb & Tyler LLP (David F. Dobbins and Julie A. Weiner, of counsel), New York, NY, for Amicus Curiae World Health Organization.

David A. Bono, Harkins Cunningham (Neill C. Kling, on the brief), Washington, D.C., for Amicus Curiae National Center for Tobacco–Free Kids.

Before: OAKES, CALABRESI, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Plaintiffs-appellants are the European Community ("EC") and various of its member states (collectively, the "EC plaintiffs"), as well as certain Departments of the nation of Colombia (the "Departments of Colombia," and collectively with the EC plaintiffs, "plaintiffs").[1] They appeal from the judgment of the United States District Court for the Eastern District of New York (Garaufis, J.), dismissing their complaints in three related suits against the defendants, tobacco product manufacturers Philip Morris, RJR Nabisco, Brown & Williamson Tobacco Corp., British American Tobacco, Japan Tobacco, Inc., and each one's affiliated entities. Plaintiffs allege that the defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, by masterminding several ongoing schemes to smuggle contraband cigarettes into the plaintiffs' territories. In the process, the defendants allegedly have entered into conspiracies to commit mail and wire fraud, money laundering, misrepresentations to customs authorities, and various common law torts. Plaintiffs claim that the defendants' conduct has caused them economic harm in the form of lost tax revenues and law enforcement costs. The district court dismissed the complaints in their entirety, finding that because plaintiffs' claims were premised on purported violations of their tax laws, they would require the court to interpret and enforce foreign revenue laws, in violation of the revenue rule and this Court's holding in *Attorney General of Canada v. R.J. Reyn-*

*olds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir.2001) (*"Canada"*), *cert. denied*, 537 U.S. 1000, 123 S.Ct. 513, 154 L.Ed.2d 394 (2002).

On appeal, plaintiffs primarily contend that *Canada* does not bar their suit because, subsequent to that decision, Congress passed the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub.L. No. 107–56, 115 Stat. 272 (the "Patriot Act"), which amended RICO to include terrorism-related offenses as predicate acts, and has legislative history that plaintiffs maintain reflects congressional intent to allow foreign sovereigns to use RICO to impose liability on domestic tobacco companies that attempt to evade their revenue laws. We hold that the Patriot Act and its legislative history do not constitute the clear evidence of congressional intent necessary to find that Congress has abrogated the revenue rule.

Plaintiffs also challenge the district court's dismissal of their RICO claims predicated on money laundering activities without leave to replead. We hold that the district court did not abuse its discretion in denying leave to replead because doing so rendered the judgment final and thus appealable. Moreover, plaintiffs have not demonstrated any prejudice arising from having to replead their claims in a new action.

Finally, the EC and its member states challenge the district court's dismissal of their action against Japan Tobacco, Inc.,

---

**1.** The EC plaintiffs, in addition to the EC itself, are the following nations: the Kingdom of Belgium, Republic of Finland, French Republic, Hellenic Republic, Federal Republic of Germany, Italian Republic, Grand Duchy of Luxembourg, Kingdom of the Netherlands, Portuguese Republic, and Kingdom of Spain. The Colombian plaintiffs are the following

Departments: Amazonas, Antioquia, Atlantico, Bolivar, Caqueta, Casanare, Cesar, Choco, Cordoba, Cundinamarca, Huila, La Guajira, Magdalena, Meta, Narino, Norte De Santander, Putumayo, Quindio, Risaralda, Santader, Sucre, Tolima, Valle Del Cauca, Vaupes, and Santa Fe De Bogota, Capital District.

and its affiliated entities, as barred by the revenue rule, on the ground that the plaintiffs had not yet had a chance to serve the defendants with the complaint when the district court rendered its decision. We hold that the dismissal was premature because absent proper service upon the defendants, the court did not yet have jurisdiction over the action. We therefore vacate and remand for further proceedings.

## BACKGROUND

This appeal arises from three actions filed by the plaintiffs that were treated as related and decided together by the district court. Because the plaintiffs make substantially similar allegations, seek the same damages, and rely on the same legal theories in the three complaints, the cases are identical in all relevant respects, and we will not differentiate among the actions, except where necessary.

The EC plaintiffs allege that the tobacco companies directed and facilitated contraband cigarette smuggling by studying smuggling routes, soliciting smugglers, and supplying them with cigarettes encased in packages that allowed the defendants to monitor and control the smuggling. The smugglers would then forge shipping documents and route the cigarettes so as to avoid paying the customs duties and excise taxes of the countries into which the cigarettes were smuggled. The profits from the smuggling were partially funneled into bonuses and kickbacks for defendants' executives. Facilitating the smuggling trade also enabled the tobacco companies to argue to the public and the EC that the high import taxes maintained by the EC's member states were fostering a black market in cigarettes. Moreover, the defendants allegedly knew or should have known that the funds used by the smugglers to purchase the cigarettes were generated through the sale of illegal narcotics in the United States and then laundered through a black market money exchange before being paid to the defendants.

The Departments of Colombia make similar allegations, claiming that the defendants have established and maintained small volumes of legal cigarette sales in Colombia in order to conceal and facilitate the many illegal shipping routes into the country. Some of the defendants collectively engaged in a number of meetings to coordinate their use of smuggling and to fix the prices of smuggled cigarettes. They have also labeled their products so as to exercise control over the smuggling, have secreted the proceeds in Swiss banks, and have lobbied for lower import taxes on the ground that high taxes promote smuggling. Finally, the defendants allegedly were aware that Colombian smugglers were funding their smuggling activities with the laundered proceeds of narcotics sales made in the United States.

The plaintiffs assert that the defendants and others participated in a smuggling enterprise within the meaning of RICO, *see* 18 U.S.C. § 1961(4), and that they committed a number of predicate acts of racketeering, including wire and mail fraud, money laundering arising from both the defendants' acceptance of the proceeds from narcotics trafficking as payment for cigarettes and their attempts to conceal their smuggling profits, and violations of the Travel Act, 18 U.S.C. §§ 1952, 1961(1)(B). They also assert a number of state common law claims against the defendants, including negligent misrepresentation, public nuisance, unjust enrichment, and common law fraud.

All of the complaints allege the same damages and seek the same monetary and injunctive relief. The plaintiffs seek treble damages pursuant to RICO, claiming that

as a result of the smuggling, "the proper duties and taxes have not been paid on the aforesaid cigarettes," including customs duties, value-added taxes, and excise taxes amounting to hundreds of millions of dollars per year. They also claim that they have been "required to expend substantial funds to fight against cigarette smuggling." In addition, the plaintiffs seek a plethora of injunctive relief that would require the defendants to cease their smuggling activities, to disgorge their profits from smuggling, and to create protocols and compliance programs that would allow the plaintiff nations' law enforcement authorities to ensure that defendants are complying with plaintiffs' customs and revenue laws.

Plaintiffs began filing these lawsuits in 2000, and since then the cases have had a somewhat complicated procedural history. Initially, the Departments of Colombia filed suit against Philip Morris, Brown & Williamson Tobacco Corporation, British American Tobacco South America Ltd., and their affiliated companies, *see Department of Amazonas v. Philip Morris Companies*, 186 F.Supp.2d 231, No. 00 Civ. 2881(NGG). Shortly thereafter, the EC, on behalf of itself, sued RJR Nabisco, Philip Morris, Japan Tobacco, British American Tobacco, Brown & Williamson, and their affiliates, *see European Community v. RJR Nabisco, Inc.*, 134 F.Supp.2d 297, No. 00 Civ. 6617(NGG), and the action was consolidated with the *Amazonas* action. The district court subsequently deconsolidated the cases and dismissed the EC's lawsuit because the EC itself did not have standing under RICO, although it reserved decision on the defendants' motion to dismiss in the *Amazonas* case. *See European Community v. RJR Nabisco, Inc.*, 150 F.Supp.2d 456, 459, 500–02 (E.D.N.Y.2001) ("*European Community I* ").

The EC again filed suit against RJR Nabisco and Philip Morris in August 2001, this time with several of its member states as co-plaintiffs, and the case was marked related to the still-pending *Amazonas* case. *See European Community v. RJR Nabisco, Inc.*, 186 F.Supp.2d 231, No. 01 Civ. 5188(NGG). In October 2001, this Court decided *Canada*, holding that claims by foreign sovereigns that were premised on violations of foreign tax laws are barred by the revenue rule. *Canada*, 268 F.3d at 126. Based on our holding in *Canada*, the defendants in the EC plaintiffs' lawsuit moved to dismiss the complaint in December 2001, and that motion was joined with the pending motion to dismiss in the *Amazonas* case. Before the district court ruled on these motions, the EC plaintiffs filed a separate lawsuit against Japan Tobacco and its affiliated companies in January 2002, containing the same allegations as its suit against RJR Nabisco. *See European Community v. Japan Tobacco, Inc.*, 186 F.Supp.2d 231, No. 02 Civ. 164(NGG). This suit was also marked related to the two pending lawsuits. In February 2002, before the EC plaintiffs had served the Japan Tobacco defendants with the summons and complaint, the district court ruled on the outstanding motions to dismiss, dismissing all three complaints as barred by the revenue rule. *European Community v. Japan Tobacco, Inc.*, 186 F.Supp.2d 231 (E.D.N.Y.2002) ("*European Community II* ").

The district court held that plaintiffs' RICO claims were premised on lost tax revenues, and *Canada* therefore required that all of the claims be dismissed. *Id.* at 236–37, 241–45. Although plaintiffs' complaints do not distinguish between "smuggling" and "money laundering" claims, but simply allege both types of conduct as predicate acts of racketeering under RICO, the district court treated them separately in its decision. The court dis-

missed the smuggling claims on the basis of the revenue rule, reasoning that, like the plaintiff foreign sovereign in *Canada,* plaintiffs here sought relief based solely on lost tax revenues and expenditures made in furtherance of their revenue laws. Adjudicating the claims would therefore require the court to interpret and enforce foreign revenue laws, in contravention of *Canada*'s holding that, in most circumstances, courts may not pass upon foreign tax laws. *Id.* at 236–37. Responding to plaintiffs' argument that our holding in *Canada* was displaced by the passage of the Patriot Act, the court concluded that the text and legislative history of the Act's RICO amendments did not provide clear evidence of congressional intent to abrogate the revenue rule. *Id.* at 238–42. The court also dismissed the money laundering claims without prejudice, finding that these claims were premised on the alleged smuggling scheme because they involved the laundering of the funds for, and proceeds from, the smuggling activities. *Id.* at 243–45. When considered independently of the smuggling allegations barred by the revenue rule, therefore, the money laundering claims did not allege any causal connection between the alleged money laundering and the lost tax revenues. *Id.* at 242–45. The district court entered judgment dismissing the complaints in all three actions on March 21, 2002. The court dismissed the smuggling claims with prejudice, and the money laundering claims without prejudice.[2] This appeal followed.

## DISCUSSION

On appeal, plaintiffs raise a number of challenges to the district court's dismissal of the three complaints. With respect to the court's decision on the merits, plaintiffs concede that our decision in *Canada* establishes that suits to enforce foreign tax laws implicate the revenue rule, but argue primarily that the legislative history of the Patriot Act, passed in October 2001, evinces congressional intent to allow foreign sovereigns to use RICO to sue tobacco companies for lost tax revenues. Thus, plaintiffs contend that the Patriot Act requires us to find that Congress has abrogated the revenue rule for the purposes of RICO suits. Plaintiffs also attempt to distinguish their claims from those at issue in *Canada* by arguing that the revenue rule is not triggered here because the executive branch has indicated its consent to this suit, and that the district court misconstrued the revenue rule as an absolute bar to suit rather than a discretionary rule, and consequently failed to exercise its discretion.

Plaintiffs also appeal the district court's dismissal of the money laundering claims without leave to replead, but do not challenge the court's substantive characterization of the claims as they were alleged in the complaints. Finally, the EC plaintiffs challenge the district court's dismissal of their suit against Japan Tobacco before it had been served with the complaint or appeared in the action.

■ We review the district court's dismissal of the complaints *de novo. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 194 (2d Cir.2003). All inferences must be drawn in favor of the plaintiffs, and we may affirm only if we find that, taking the allegations in the complaints as true, the plaintiffs have alleged no facts upon which they can be granted relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). We review the district

---

**2.** Although the district court at first granted leave to replead the money laundering claims, it later amended its judgment to deny leave to replead.

court's denial of leave to replead for abuse of discretion. *Oneida Indian Nation v. City of Sherrill,* 337 F.3d 139, 168 (2d Cir.2003).

## I. The Revenue Rule Holding

### A. *Canada*'s Explication of the Revenue Rule

We explained in *Canada* that the common law revenue rule holds that the "courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Canada,* 268 F.3d at 109. The revenue rule is implicated whenever "the substance of the claim is, either directly or indirectly, one for tax revenues," *id.* at 130, such that "the whole object of the suit is to collect tax for a foreign revenue, and that this will be the sole result of a decision in favour of the plaintiff," *id.* at 131 (quoting *United States v. Harden,* [1963] S.C.R. 366, 371). A suit directly seeks to enforce foreign tax laws when a judgment in favor of the plaintiffs would require the defendants to reimburse them for lost tax revenues. In contrast, indirect enforcement occurs when a foreign state seeks a remedy that would give extraterritorial effect to its tax laws; for instance, a suit seeking damages based on law enforcement costs is an attempt to shift the cost of enforcing the tax laws onto the defendants, and would therefore require the court indirectly to enforce the tax laws. *Id.* at 131–32.

*Canada* holds that the revenue rule reflects both sovereignty and separation of powers concerns. *Id.* at 126. The courts of one sovereign will not enforce the laws of another sovereign if they are contrary to the public policy of the forum state. Tax laws strongly implicate this principle, as they often embody the political and social judgments of the sovereign and its people. Accordingly, claims by foreign sovereigns invoking their tax statutes may embroil the courts in an evaluation of the foreign nation's social policies, an inquiry that can be embarrassing to that nation and damaging to the forum state. *Id.* at 112. Moreover, because the conduct of foreign relations is primarily the realm of the legislative and executive branches, judicial examination and enforcement of foreign tax laws at the behest of foreign nations may conflict with the other branches' policy choices with respect to cooperation in tax enforcement, and create the risk that the judiciary will be "drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government." *Id.* at 114–16, 123.

Although the revenue rule arose out of the pragmatic desire of eighteenth-century English judges to promote "British trade that would otherwise have been unlawful," *European Community II,* 186 F.Supp.2d at 234 (internal quotation marks omitted), we held that it remains in force because it continues to protect modern separation of powers and sovereignty concerns, *Canada,* 268 F.3d at 109–15. In *Canada,* we undertook an extensive examination of the tax treaties in effect between the United States and other nations, and concluded that their grant of only limited reciprocal tax enforcement assistance reflected the political branches' continuing recognition of the revenue rule. *Id.* at 115–19. Thus, the modern revenue rule is rooted in both our perception that the branches of government responsible for conducting foreign affairs wish to uphold the rule, and our reluctance to intrude upon the greater expertise of the political branches by abrogating the rule without evidence that doing so would be consonant with the policies of the other branches.

The revenue rule is therefore not absolute. Even if the substance of the claim invokes foreign tax laws, the revenue rule

will not be triggered where the sovereignty and extraterritoriality concerns that inform the rule's application are not present. Thus, for example, where the executive branch has "expressed its consent to adjudication by the courts," the institutional and separation of powers concerns behind the rule are mitigated, because the branch with primary responsibility for conducting foreign relations has indicated that extraterritorial enforcement of the foreign tax laws at issue is in the interests of the United States. *Id.* at 113, 123 n. 25. In *Canada,* we suggested that executive consent may be found where the United States itself institutes a prosecution designed to punish those who have defrauded foreign governments of tax revenues, or where the treaties between the United States and the sovereigns at issue provide for broad, reciprocal tax enforcement assistance. *Id.* at 113, 121–24 & nn.24–25. The executive also might indicate its consent to the suit by other means, such as submitting a statement from the State Department or filing an amicus brief.

Absent such indication that the executive branch consents to the suit, a claim that triggers the revenue rule is barred unless the plaintiffs establish that superior law, such as the federal statute that provides the applicable right of action, abrogates the rule in the context in which the plaintiffs seek to enforce their tax laws. *See id.* at 113, 119, 126. Because the revenue rule is a longstanding common law rule, and its abrogation in any one situation necessarily impacts foreign relations, a statute or treaty "must speak directly to the matter" in order to abrogate it. *Id.* at 129 (internal quotation marks omitted).

In *Canada,* we held that RICO, as enacted in 1970, does not contain the clear evidence of congressional intent necessary to rebut the presumption that statutes are enacted against the background of the common law and abrogate the revenue rule. *Id.* We found nothing in RICO's text that explicitly authorizes foreign nations to use RICO's civil remedy provisions to enforce their tax laws extraterritorially, and its legislative history did not contain any manifestation of congressional intent to grant such authorization. *Id.*

## B. Application of the Revenue Rule to Plaintiffs' Allegations

■ The allegations in plaintiffs' complaint are markedly similar to those at issue in *Canada.* Plaintiffs are foreign sovereigns attempting to use RICO to impose liability on various domestic and foreign tobacco companies for smuggling and money laundering, premising their assertions of injury to business and property on the taxes that they would have levied on the cigarettes, had they been legitimately imported, and on the costs of enforcing their tax laws. *Cf. id.* at 132–33. Because plaintiffs' claims arise exclusively from tax-related losses and costs, adjudicating these claims would implicate the concerns discussed in *Canada,* requiring the court to evaluate the policies behind the relevant foreign tax laws, interpret their provisions, and enforce them by awarding damages. *Canada* is therefore controlling, and we must hold that plaintiffs' claims trigger the revenue rule [3] and are barred unless plaintiffs establish that Congress has abrogated the revenue rule as it applies to the circumstances of this case.[4]

---

**3.** Although plaintiffs also argue that the revenue rule is not implicated by their claims, we will first discuss their primary argument, that the Patriot Act has abrogated the rule.

**4.** Judge Calabresi, a member of this panel, dissented in *Canada,* 268 F.3d at 135. Although he continues to believe that *Canada* was wrongly decided, he, like the other members of this panel, recognizes that we are

Plaintiffs argue that, even though *Canada* held that RICO does not abrogate the revenue rule, the recent amendments to RICO passed as part of the Patriot Act in October 2001 demonstrate Congress's intent to abrogate the rule. The crux of plaintiffs' argument, both on appeal and below, is that the addition of several money laundering crimes to RICO's predicate acts evinces Congress's understanding that the purpose of RICO is to prevent precisely the conduct alleged here, and the legislative history of the amendments, particularly Congress's deletion from the draft statute of an amendment that would have codified the *Canada* holding, provides clear evidence of Congress's intent to abrogate the rule.

Plaintiffs first focus on the text of the Patriot Act's amendments to RICO, contending that the addition of several international money laundering predicate offenses, such as money laundering crimes against foreign nations and financial conduct that aids terrorist groups, reflects congressional intent to abrogate the revenue rule. *See* 18 U.S.C. § 1956(c)(7). We disagree. The Patriot Act did not change the structure or focus of RICO; it simply added additional offenses to those that constitute predicate acts of racketeering. While we stated in *Canada* that the presumption against statutory derogation of the common law does not apply when "a statutory purpose to the contrary is evident," *Canada*, 268 F.3d at 127 (internal citation omitted), the recent additions to RICO have not so altered RICO's statutory scheme or apparent purpose as to warrant our revisiting *Canada*'s conclusion that RICO does not abrogate the revenue rule. Plaintiffs may be correct that the RICO amendments contained in the Patriot Act are designed to combat precisely the conduct alleged here; but the conduct

alleged in *Canada* was also within the scope of RICO's prohibitions, *see id.* at 106–08. Because *Canada* holds that the operation of the rule does not depend on the type of conduct alleged, but rather on the substance of the relief sought, the foreign policy concerns raised by the suit, and the identity of the plaintiffs, a mere showing that the plaintiffs' suit will further the policies embodied in the statute at issue is not sufficient to abrogate the rule. Rather, the statute must provide clear evidence, textual or otherwise, that Congress believes that the revenue rule should not apply. *Id.* at 128.

Plaintiffs further argue that Congress provided the necessary evidence of congressional intent to abrogate the revenue rule by deleting a provision in the initial version of the Act that would have stated that the addition of the money laundering offenses did not expand the jurisdiction of the courts to hear claims based on foreign excise taxes. The section of the Act that added new international money laundering offenses to RICO's list of predicate acts, *see* 18 U.S.C. §§ 1956, 1961(1), initially provided that the amendments were subject to the following rule of construction:

> (b) **RULE OF CONSTRUCTION.—** None of the changes or amendments made by the Financial Anti–Terrorism Act of 2001 shall expand the jurisdiction of any Federal or State court over any civil action or claim for monetary damages for the nonpayment of taxes or duties under the revenue laws of a foreign state, or any political subdivision thereof, except as such actions or claims are authorized by [a] United States treaty that provides the United States and its political subdivisions with reciprocal rights to pursue such actions or claims

bound by circuit precedent, and that *Canada*  controls the disposition of this case.

in the courts of the foreign state and its political subdivisions.

Financial Anti–Terrorism Act of 2001, H.R. 3004, 107th Cong. § 106(b).[5] This provision was deleted from subsequent versions of the Act, however; as the October 23, 2001 section-by-section analysis of the Act notes, the House of Representatives "dropped [the] provision carving out tobacco companies from RICO liability for foreign excise taxes." 147 Cong. Rec. H7198 (daily ed. Oct. 23, 2001). In addition, several individual legislators indicated their opposition to the rule of construction after it was dropped from the bill. For instance, Senator John Kerry, the author of the money laundering provisions, stated that the provision conflicted with "the intent of the legislature that our allies will have access to our courts and the use of our laws if they are victims of smuggling, fraud, money laundering, or terrorism." 147 Cong. Rec. S11028 (daily ed. Oct. 25, 2001). Plaintiffs argue that the omission of this provision from the enacted text of the Act, as well as the statements by individual legislators indicating opposition to the provision, provide the clear evidence of congressional intent necessary to abrogate the revenue rule.

As an initial matter, plaintiffs have provided no evidence that the deletion of the rule of construction has any effect on the meaning of the Act's amendments to RICO. In deleting the rule of construction that would have codified *Canada*'s holding, Congress left the enacted text of RICO just as silent on the issue of abrogation as it was when *Canada* was decided. Moreover, the absence of the rule of construction does not add any meaning to the text of the new predicate offenses, or suggest that those amendments are in any way meant to abrogate the revenue rule.

We cannot find clear evidence of congressional intent to overrule *Canada* and abrogate the revenue rule as it applies to RICO suits from legislative history that is not related to any actual amendment to RICO. *See Shannon v. United States*, 512 U.S. 573, 583, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (noting that courts do not give "authoritative weight" to elements of the legislative history that are "in no way anchored in the text of the statute").

■ Nonetheless, plaintiffs assert a number of arguments in an attempt to establish that the legislative history alone compels us to find congressional intent to abrogate the revenue rule. They first contend that the deletion itself is sufficient evidence of legislative intent to abrogate the rule, relying on the Supreme Court's statement, in the context of interpreting a term within a RICO provision, that "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23–24, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (interpreting the word "interest" in the context of RICO's enterprise provisions). While this rule of construction is helpful in giving meaning to a particular term or phrase contained within a statutory provision, it may not be used to effectively amend a statute where Congress has not actually altered its enacted text. The mere deletion of the provision is a far more ambiguous act than plaintiffs suggest, because Congress's reluctance to codify *Canada*'s holding does not necessarily reflect its desire to overrule that holding. "[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute," as

---

5. The Financial Anti–Terrorism Act of 2001 was later subsumed into the Patriot Act. *See*

147 Cong. Rec. H7198 (daily ed. Oct. 23, 2001).

"congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *United States v. Craft*, 535 U.S. 274, 287, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (internal quotation marks and citations omitted). This is particularly the case here, where the proposed amendment simply would have codified the revenue rule as it was explicated in *Canada*, and would not have effected any change in the law. Thus, the deletion alone, untethered to the actual enactment, cannot provide a basis upon which to infer any congressional intent to abrogate the revenue rule, much less the clear evidence required by our holding in *Canada*.

Plaintiffs contend, however, that the statements of several legislators to the effect that foreign nations should be able to use RICO to impose liability on domestic companies for foreign excise taxes indicate that the provision was deleted because Congress intended to abrogate the rule. Several legislators clearly disagreed with the revenue rule, and made remarks to this effect. *See* 147 Cong. Rec. E1936 (daily ed. Oct. 29, 2001) (statement of Rep. Wexler) ("I am pleased that a provision earlier included ... which would have inhibited RICO liability for foreign excise taxes for tobacco companies, has been dropped from the USA PATRIOT Act ...."); *id.* at H7205 (daily ed. Oct. 23, 2001) (statement of Rep. Conyers) ("I am very proud [that] we dropped the administration proposal ... that would have ... prevented RICO liability for tobacco companies ...."); *id.* at S11028 (daily ed. Oct. 25, 2001) (statement of Sen. Kerry) ("The

House-passed rule of construction could have potentially limited the access of foreign jurisdictions to our courts ...."); *id.* at S11007 (daily ed. Oct. 25, 2001) (statement of Sen. Leahy) (stating that Congress had eliminated the "carve-out of tobacco companies from RICO liability for foreign excise taxes"). None of these statements represent the "collective understanding" of the committees responsible for the Act,[6] however, and they are therefore not entitled to very much weight. *See United States v. Nelson*, 277 F.3d 164, 186–87 (2d Cir.2002), *cert. denied*, 537 U.S. 835, 123 S.Ct. 145, 154 L.Ed.2d 54 (2002) ("We ... 'eschew[ ] reliance on the passing comments of one Member, and casual statements from the floor debates.'") (quoting *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). Because the legislative record does not suggest anything other than that a few individual legislators wished to abrogate the revenue rule, those legislators' statements do not render the deletion of the proposed rule of construction unambiguous, or provide adequate insight into that deletion. Taken as a whole, the legislative history does not provide clear evidence that Congress intended to abrogate the revenue rule when it enacted the Patriot Act.

Plaintiffs next argue, in the alternative, that the legislative history of the Patriot Act constitutes persuasive post-enactment evidence that Congress intended RICO, as enacted in 1970, to abrogate the revenue rule. This is, in essence, an invitation to revisit *Canada*'s holding that RICO, as it then existed, did not abrogate the revenue rule, in light of the statements

---

**6.** Although plaintiffs refer to the section-by-section analysis of the Act inserted into the legislative record by Senator Leahy as the "Senate's [R]eport," *see* 147 Cong. Rec. S11007 (daily ed. Oct. 25, 2001), there is no Senate Report on the Patriot Act. The analysis is simply Senator Leahy's own discussion of the provisions of the Act. *See id.* at S10990 (Oct. 25, 2001).

made in relation to the proposed rule of construction. The Patriot Act's legislative history, however, does not provide clear evidence of any congressional understanding that RICO has always abrogated the revenue rule. First, the individual legislators' comments indicate, at most, a reluctance to enact the common law revenue rule into the statutory text. They do not explicitly or implicitly express the view that RICO itself abrogates the revenue rule, and we are unwilling to infer this belief from a few passing statements commenting on a provision that had already been removed from the text of the Patriot Act. Second, as noted above, the isolated statements of individual legislators do not express the intent of Congress as a whole, and are therefore weak evidence of post-enactment intent. Third, expressions of legislative intent made years after the statute's initial enactment are entitled to limited weight under any circumstances, even when the post-enactment views of Congress as a whole are evident. *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) ("[T]he views of one Congress as to the construction of a statute adopted many years before by another Congress have very little, if any, significance.") (internal quotation marks omitted). Thus, these statements do not convince us that *Canada* wrongly concluded that the 91st Congress did not intend to abrogate the revenue rule when it enacted RICO.

We do not hold that a statute's legislative history may never contain sufficient indicia of congressional intent to find that the statute abrogates the revenue rule. *Cf. Canada*, 268 F.3d at 129 (noting that a statute's legislative history and purpose, as well as its text, may be relevant to the inquiry into whether it abrogates the revenue rule). Here, however, the purported evidence of intent to abrogate on which plaintiffs rely is particularly weak. We cannot find that a few remarks in the legislative history of the recent amendments to RICO, and the deletion of a provision that would have codified *Canada*, have altered the statute itself, or provided a reliable indicator of congressional intent in the absence of an actual enactment. Were we to treat Congress's decision not to enact the proposed rule of construction as an explicit abrogation of the revenue rule, we would be privileging the legislative history of the Patriot Act over its enacted language. To do so would turn on its head the rule that any analysis of a statute and Congress's intent in enacting it must primarily be founded in the text of the statute itself. *See Shannon*, 512 U.S. at 583, 114 S.Ct. 2419 ("To give effect to this snippet of legislative history, we would have to abandon altogether the text of the statute as a guide in the interpretative process.").

## C. Plaintiffs' Remaining Attempts to Distinguish *Canada*

Plaintiffs also attempt to distinguish their claims from those at issue in *Canada* by arguing that the foreign policy concerns necessary to trigger the revenue rule are not present here. All of these arguments are foreclosed by *Canada*, however, and do not change our conclusion that the revenue rule is implicated by plaintiffs' claims.

First, plaintiffs argue that the several treaties of friendship between the United States and EC member states indicate that the political branches intend to provide foreign nations with unlimited access to domestic courts.[7] This contention is sim-

7. The Palermo Convention of 2000, Vienna Convention of 1988, and Joint European Union–United States Ministerial Statement on Combating Terrorism (2001) all express a pol-

ply an attempt to reargue *Canada,* which examined the tax treaties currently in force between the United States and various nations, *Canada,* 268 F.3d at 115–22, and concluded that the revenue rule remains "fully consistent with our broader legal, diplomatic, and institutional framework," *id.* at 119. Plaintiffs have not proffered any evidence of a shift in United States policy with respect to tax treaties and enforcement assistance since our decision in *Canada,* and thus we cannot conclude that the political branches now intend to provide judicial tax enforcement assistance to other nations.[8]

■ Second, plaintiffs contend that, even though the landscape of treaties has not changed since our decision in *Canada,* the executive branch has indicated its consent to this suit, obviating the separation of powers and sovereignty concerns that trigger the rule. The United States has not intervened in opposition to this suit, despite its purported knowledge of the action, and plaintiffs argue that this "neutrality" evidences the United States's judgment that this lawsuit is not antithetical to

United States foreign policy interests. We, however, require more than executive inaction in order to find consent to the suit. Rather, the executive branch must affirmatively "express its consent" or approval, for instance, by bringing suit itself. *Id.* at 123 & n. 25. Because the political branches have chosen to negotiate treaties providing for only limited reciprocal tax enforcement assistance to other nations, *see id.* at 115–22, absent affirmative consent to a suit by the executive branch, we must assume that a lawsuit seeking general extraterritorial enforcement of foreign tax laws exceeds the bounds of the assistance that the executive branch has decided to give. Moreover, were executive inaction sufficient to render the revenue rule inoperative in a given case, the United States would be required to intervene in every case that might implicate the revenue rule. Such a proposition is clearly untenable.

■ Third, plaintiffs attempt to distinguish their claims by focusing on their requests for injunctive relief, arguing that

---

icy of cooperation and reciprocal access to foreign and domestic courts in order to combat organized crime and terrorism. *See The United Nations Convention Against Transnational Organized Crime, opened for signature* Dec. 12, 2000, 40 I.L.M. 335 (unratified by the United States); *United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances,* Dec. 20, 1988, S. Treaty Doc. No. 101–4 (entered into force Nov. 11, 1990); *Joint EU–US Ministerial Statement on Combating Terrorism,* Sept. 20, 2001, 40 I.L.M. 1263. In *Canada,* however, we implicitly acknowledged that foreign sovereigns have long had access to United States courts, and may sue for violations of domestic laws, *see Canada,* 268 F.3d at 123, but because the revenue rule has reflected the reluctance of the United States and many other nations to enforce foreign tax laws for two hundred years, *id.* at 110, we looked to our nation's tax treaties, rather than treaties that simply provide general access to courts, to

determine whether the political branches' actions indicated an abandonment of the rule. Thus, the treaties that plaintiffs cite are not particularly relevant to whether the revenue rule should apply here.

8. Indeed, plaintiffs attempt to argue that the numerous tax treaties between the United States and several of the plaintiff nations that provide for only limited tax assistance are irrelevant, because plaintiffs' claims are based not on the treaties but on RICO, rendering their claims civil suits pursuant to United States law rather than foreign tax enforcement claims. This argument is foreclosed by *Canada,* in which we noted that if the substance of a suit seeks extraterritorial tax enforcement, the fact that the suit is brought as a civil claim under domestic law does not affect the application of the revenue rule. *Id.* at 131.

"[i]njunctive relief to enjoin or abate conduct on U.S. soil does not involve foreign tax law in any way." Adjudicating plaintiffs' entitlement to injunctive relief, however, would require the court to evaluate and interpret foreign tax laws. Moreover, the requested injunctions would have the effect of extraterritorially enforcing plaintiffs' tax laws just as directly as would their claims for damages, as plaintiffs would have the court order the defendants to cease their smuggling operations, disgorge their profits, and put into place measures that would allow foreign customs officials to ensure that they are complying with those nations' revenue laws. Thus, the requested relief, though different in form, has the same implications as plaintiffs' claims for damages, and is barred by the revenue rule. *See id.* at 131.

Finally, plaintiffs argue that even if their claims implicate the revenue rule, it is a discretionary doctrine that, when triggered, allows the district court to consider the foreign relations implications and domestic law enforcement interests at stake before deciding whether to "abstain" from hearing the claims.[9] This argument is also foreclosed by *Canada*, which clearly establishes that, once the sovereignty and separation of powers concerns that inform the rule are implicated by the substance of a plaintiff's claims, the court may not hear those claims absent evidence that the rule has been abrogated. *Id.* at 113. Thus, the district court did not misconstrue the nature of the rule.

## II. The District Court's Denial of Leave to Replead the Money Laundering Claims

■ Plaintiffs also argue that the district court abused its discretion in dismissing their money laundering claims without leave to replead. The district had initially dismissed the claims "without prejudice to replead," but later amended its judgment to dismiss the claims "without prejudice." We review the denial of leave to replead for abuse of discretion, *Oneida Indian Nation v. City of Sherrill*, 337 F.3d 139, 168 (2003), and find none here.[10]

Although the court did not explain its reasoning for amending the judgment and denying leave to replead, the denial had the effect of rendering the judgment final as to all claims and allowing an appeal of the entire case. *See Elfenbein v. Gulf & Western Indus., Inc.*, 590 F.2d 445, 449 (2d Cir.1978). Because rendering a final judgment in order to make the decision appealable is a logical reason for denying leave to replead, and plaintiffs have not demonstrated that they are in any way prejudiced by the necessity of repleading their money laundering claims in a new lawsuit, we find that the district court did not abuse its discretion in dismissing the money laundering claims without leave to replead.

9. As part of this argument, plaintiffs contend that the district court should have considered the factual nature of each claim separately, and that "[t]he district court wrongly expanded the revenue rule to 'preempt' state common law without considering the substance of each claim and without finding specific conflicts with federal policy." Because appellants' state law claims are completely duplicative of their RICO claims, in terms of the conduct alleged and the monetary and injunctive relief sought, the district court was correct to find that these claims also implicate the revenue rule.

10. Because plaintiffs do not challenge the district court's analysis of their money laundering claims, and they are free to replead these claims in a separate action, we do not review the court's determinations as to the nature of the claims and plaintiffs' allegations of causation. *See European Community II*, 186 F.Supp.2d at 242–43.

### III. The District Court's Dismissal of the Japan Tobacco Action

 The district court dismissed the EC plaintiffs' action against Japan Tobacco and its affiliated companies along with the two other related lawsuits, even though Japan Tobacco had not yet been served in the action and had not appeared or joined in the motion to dismiss. Because no adverse party had been joined, the district court had not yet assumed jurisdiction over the case. The dismissal for failure to state a claim was therefore premature. *Lewis v. State of New York*, 547 F.2d 4, 6 (2d Cir.1976) (holding that a district court may not dismiss for failure to state a claim before an adverse party has appeared in the suit).

Moreover, the Federal Rules of Civil Procedure allow plaintiffs 120 days after the filing of an action to serve the defendants with the summons and complaint. Fed.R.Civ.P. 4(m). Because plaintiffs had approximately 90 days left in which to serve the defendants when the court dismissed the claim, there was no procedural basis for the dismissal under the Federal Rules.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED as to the judgments in *European Community v. RJR Nabisco, Inc.*, 2004 WL 60976, No. 02–7330, and *Department of Amazonas v. Philip Morris Companies*, No. 02–7325. Because we affirm the judgment below based on the revenue rule, we need not address the other arguments raised by the defendants on appeal.

The district court's judgment as to *European Community v. Japan Tobacco, Inc.*, No. 02–7323, is VACATED and REMANDED for proceedings consistent with this opinion.