**THE EUROPEAN COMMUNITY, Acting on its own behalf and on behalf of the Member States it has power to represent, and the Kingdom of Belgium, Republic of Finland, French Republic, Hellenic Republic, Federal Republic of Germany, Italian Republic, Grand Duchy of Luxembourg, Kingdom of the Netherlands, Portuguese Republic, and Kingdom of Spain, Individually, Plaintiffs–Appellants,**

v.

**RJR NABISCO, INC., R.J. Reynolds Tobacco Co., R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco International, Inc., RJR Acquisition Corp., f/k/a Nabisco Group Holdings Corp. and R.J. Reynolds Tobacco Holdings, Inc., Defendants–Appellees.**

Department of Amazonas, Department of Antioquia, Department of Atlantico, Department of Bolivar, Department of Caqueta, Department of Casanare, Department of Cesar, Department of Choco, Department of Cordoba, Department of Cundinamarca, Department of Huila, Department of La Guajira, Department of Magdalena, Department of Meta, Department of Narino, Department of Norte De Santander, Department of Putumayo, Department of Quin-

pelled," 8 U.S.C. § 1252(b)(4)(B), to credit Wang's belated change of story.

dio, Department of Risaralda, Department of Santander, Department of Sucre, Department of Tolima, Department of Valle Del Cauca, Department of Vaupes and Santa Fe De Bogota, Capital District, Plaintiffs–Appellants,

v.

Philip Morris Companies, Inc., Philip Morris Incorporated, d/b/a Philip Morris Products, Inc., Philip Morris Latin America Sales Corporation, Philip Morris Duty Free, Inc., British American Tobacco (Investments) Ltd., B.A.T. Industries, P.L.C., Brown & Williamson Tobacco Corporation, USA, Batus Tobacco Services, Inc. and British American Tobacco (South America) Ltd., Defendants–Appellees.

The European Community, Acting on its own behalf and on behalf of the Member States it has power to represent, and the Kingdom of Belgium, Republic of Finland, French Republic, Hellenic Republic, Federal Republic of Germany, Italian Republic, Grand Duchy of Luxembourg, Kingdom of the Netherlands, Portuguese Republic, and Kingdom of Spain, Individually, Plaintiffs–Appellants,

v.

Japan Tobacco, Inc., JT International Manufacturing America, Inc., JTI Duty–Free USA, Inc., JT International S.A., Japan Tobacco International U.S.A., Inc. and Premier Brands, Ltd., Defendants–Appellees.

Docket No. 02–7325(L), 02–7330(CON), 02–7323.

United States Court of Appeals, Second Circuit.

Argued: Jan. 29, 2003.

Decided: Sept. 13, 2005.

John J. Halloran, Jr., Speiser, Krause, Nolan & Granito, New York, NY, for Plaintiffs–Appellants.

Murray R. Garnick, Arnold & Porter LLP, New York, NY, for Defendants–Appellees.

Before: OAKES, CALABRESI, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

This matter returns to us following a remand by the Supreme Court. *See European Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123 (2d Cir.2004) (*"EC I "*), *vacated and remanded by European Cmty. v. RJR Nabisco*, —— U.S. ——, 125 S.Ct. 1968, 161 L.Ed.2d 845 (2005). Our previous decision held that civil suits brought by foreign sovereigns under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"), to recover law enforcement costs and tax revenue lost to smuggling are barred by the revenue rule, under which United States courts generally may not interpret and enforce foreign revenue laws. *See EC I*, 355 F.3d at 127; *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir.2001) (*"Canada "*), *cert. denied*, 537 U.S. 1000, 123 S.Ct. 513, 154 L.Ed.2d 394 (2002). The Supreme Court vacated that decision and remanded for reconsideration in light of its decision in *Pasquantino v. United States*, —— U.S. ——, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005), an opinion issued while plaintiffs' petition for a writ of certiorari in *EC I* was pending. *See European Cmty.*, 125 S.Ct. at 1968. We have considered *Pasquantino v. United States* and the parties' letter briefs concerning its impact on *EC I* and reinstate our decision in *EC I*.

## BACKGROUND

Plaintiffs-appellants are the European Community ("EC") and various of its member states ("EC plaintiffs"), as well as certain Departments of the nation of Colombia (the "Departments of Colombia")

(collectively, "plaintiffs").[1] This appeal arose from three actions that were treated as related and decided together by the district court. *See EC I*, 355 F.3d at 128. The plaintiffs made substantially similar allegations, sought the same damages, and relied on the same legal theories in their three complaints. *Id.* In two of the complaints, the EC plaintiffs alleged that tobacco companies directed and facilitated the smuggling of contraband cigarettes. *Id.* In a third complaint, the Departments of Colombia made similar allegations, claiming that tobacco companies directed and facilitated the smuggling of cigarettes into their country. *Id.*[2]

The plaintiffs claimed that the defendants had participated in a smuggling enterprise within the meaning of RICO and committed various predicate acts of racketeering, including mail and wire fraud, money laundering, and others. *Id.* at 128. The complaints all sought to recover treble damages, pursuant to RICO, for duties and taxes not paid on the cigarettes. They further sought to recover funds which they had been "required to expend ... to fight against cigarette smuggling." *Id.* at 129. Finally, the complaints sought various forms of injunctive relief that would end the defendants' alleged smuggling and help ensure future compliance. *Id.* The district court dismissed all of the smuggling-related claims as barred by the revenue rule. *Id.*[3]

The plaintiffs appealed to this Court. We held that the revenue rule barred the foreign sovereigns' civil claims for recovery of lost tax revenue and law enforcement costs. *See* 355 F.3d at 127. We affirmed the judgment of the district court on the revenue rule question[4] and the plaintiffs filed a petition for a writ of certiorari from the Supreme Court. *See* 2004 WL 831362 (U.S. Apr.12, 2004) (No. 03–1427).

While the petition was pending, the Supreme Court issued its opinion in *Pasquantino v. United States*, —— U.S. ——, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005), a case dealing with the revenue rule's application to the criminal prosecution of smugglers under the wire fraud statute, 18 U.S.C. § 1343. In *Pasquantino*, the Supreme Court specifically declined to express a view as to "whether a foreign government, based on wire or mail fraud

---

1. The EC plaintiffs, in addition to the EC itself, are: the Kingdom of Belgium, the Republic of Finland, the French Republic, the Hellenic Republic, the Federal Republic of Germany, the Italian Republic, the Grand Duchy of Luxembourg, the Kingdom of the Netherlands, the Portuguese Republic, and the Kingdom of Spain. The Colombian plaintiffs are the following Departments: Amazonas, Antioquia, Atlantico, Bolivar, Caqueta, Casanare, Cesar, Choco, Cordoba, Cundinamarca, Huila, La Guajira, Magdalena, Meta, Narino, Norte De Santander, Putumayo, Quindio, Risaralda, Santander, Sucre, Tolima, Valle Del Cauca, Vaupes and Santa Fe De Bogota, Capital District.

2. A complete description of the allegations in the complaint may be found in our discussion in *EC I, see* 355 F.3d at 128, which we need not reprise here.

3. The district court also dismissed certain money-laundering claims without leave to replead, which we found was not an abuse of discretion. *Id.* at 139. This part of our decision is not affected by *Pasquantino*, and we do not reconsider it here.

4. We affirmed the judgment of the district court in *European Community v. RJR Nabisco, Inc.*, 355 F.3d 123, and *Department of Amazonas v. Philip Morris Cos.*, No. 02–7325. The district court's judgment in *European Community v. Japan Tobacco, Inc.*, 2002 WL 32443614, was vacated and remanded for further proceedings consistent with our opinion, because the district court prematurely dismissed the action before an adverse party was joined. *See EC I,* 355 F.3d at 138.

predicate offenses, may bring a civil action under [RICO] for a scheme to defraud it of taxes." 125 S.Ct. at 1771 n. 1. Not long after *Pasquantino* was decided, the Supreme Court vacated our judgment in *EC I* and remanded it to us for further consideration in light of *Pasquantino*. *See European Cmty. v. RJR Nabisco*, —— U.S. ——, 125 S.Ct. 1968, 161 L.Ed.2d 845 (2005). We requested letter briefs addressing the impact of *Pasquantino*, which the parties provided. We now reconsider our decision in *EC I*.[5]

## DISCUSSION

■■■ We are "bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of our Court or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir.2004). We recognize an exception to this general rule "where there has been an intervening Supreme Court decision that casts doubt on our controlling precedent." *Union of Needletrades, Industrial & Textile Employees v. INS*, 336 F.3d 200, 210 (2d Cir.2003). The Supreme Court has taken two relevant actions since *EC I*: its decision in *Pasquantino v. United States*, —— U.S. ——, 125 S.Ct. 1766, 161 L.Ed.2d 619, and its order that we reconsider *EC I* in light of *Pasquantino*. *See* —— U.S. ——, 125 S.Ct. 1968, 161 L.Ed.2d 856 (2005). We will of course reconsider *EC I* as instructed, but we reinstate it as our controlling precedent because the intervening decision in *Pasquan-*

*tino* does not substantively "cast doubt" on it.

## I. The Revenue Rule and Civil RICO Claims by Foreign Governments

■■■Under the long-standing common law doctrine known as the "revenue rule," the courts of one nation will not enforce final tax judgments or unadjudicated tax claims of other nations. *Canada*, 268 F.3d at 106. In *Canada*, the Canadian government sought recovery under RICO of tax revenue and law enforcement costs lost to smuggling. *Id.* at 106, 131–32. We held that recovery of unpaid taxes would constitute "direct enforcement" of a foreign sovereign's tax laws, and recovery of law enforcement costs would constitute "indirect enforcement." *Id.* at 131–32. We concluded that RICO did not abrogate the revenue rule, *see id.* at 109, and that both claims were therefore barred by that rule. *Id.* at 131–32.[6]

The plaintiffs in the present case, as in *Canada*, are foreign sovereigns suing under RICO for law enforcement costs and tax revenue lost to smuggling. *EC I*, 355 F.3d at 132. In the briefs and argument which led to our decision in *EC I*, the plaintiffs argued that the revenue rule had been abrogated by amendments to RICO embodied in the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub.L. No. 107–56, 115 Stat. 272 (the "Patriot Act").

---

**5.** On July 5, 2005, we granted a motion by the European Community plaintiffs for voluntary dismissal with prejudice only as to the Philip Morris appellees in *European Community v. RJR Nabisco, Inc.*, 355 F.3d 123. The RJR Nabisco appellees in that case, and all parties in the other cases, remain the same as in *EC I*.

**6.** Judge Calabresi, a member of this panel, dissented in *Canada*, 268 F.3d at 135. As we noted in *EC I*, 355 F.3d at 132 n. 4, although he continues to believe that *Canada* was wrongly decided, Judge Calabresi, like the other members of this panel, recognizes that we are bound by circuit precedent, and that *Canada* controls the disposition of this case because *Pasquantino* does not cast doubt on the holding in *EC I*.

The Patriot Act added certain smuggling or export control violations to the list of RICO predicate acts under 18 U.S.C. § 1956(c)(7). Pub.L. No. 107–56, § 315. These new provisions dealt with precisely the type of conduct alleged by the plaintiffs in *EC I*. *EC I*, 355 F.3d at 133.[7] Nevertheless, we found that neither the amendments nor their legislative history evidenced Congress's intent to abrogate the revenue rule to allow claims such as the plaintiffs'. *See id.*

We stressed in our opinion that the revenue rule is designed to address two concerns: first, that policy complications and embarrassment may follow when one nation's courts analyze the validity of another nation's tax laws; and second, that the executive branch, not the judicial branch, should decide when our nation will aid others in enforcing their tax laws. *Id.* at 131. These twin concerns for sovereignty and separation of powers are important to the revenue rule analysis, because they imply certain exceptions to the rule. In particular, when the executive branch affirmatively consents to litigation (e.g., by initiating it in a criminal prosecution), there is little reason to worry about infringing on the executive's sphere of decision-making, and the rule will not be applied. *Id.* at 132.

## II. *Pasquantino* and Its Impact

■ *Pasquantino* considered whether the revenue rule precluded a criminal prosecution for wire fraud under 18 U.S.C. § 1343 for use of interstate wirings as part of a scheme to smuggle liquor into Canada. The Supreme Court first determined that Canada's right to collect tax money was "property" for purposes of the statute, and

that a plot to smuggle liquor into Canada was a scheme to defraud Canada of that right to collect tax money. 125 S.Ct. at 1772–73. Thus, the plain language of the statute created liability for this type of smuggling. *Id.* The Court then held that the revenue rule did not preclude criminal prosecutions of this kind.

> None [of the cited cases applying the revenue rule] involved a domestic sovereign acting pursuant to authority conferred by a criminal statute. The difference is significant. An action by a domestic sovereign enforces the sovereign's own penal law. A prohibition on the enforcement of *foreign* penal law does not plainly prevent the *Government* from enforcing a *domestic* criminal law.

*Id.* at 1776 (second emphasis added). The Court admitted that "this criminal prosecution 'enforces' Canadian revenue law in an attenuated sense," but held the connection too attenuated to trigger the rule. *Id.* at 1778.

The Supreme Court also analyzed the question in light of the purposes of the revenue rule and found that concerns about sovereignty and separation of powers were not implicated where the United States government brings a criminal prosecution. *See id.* at 1779–80. First, in light of the government's decision to prosecute, the Court found "little risk of causing the principal evil against which the revenue rule was traditionally thought to guard: judicial evaluation of the policy-laden enactments of other sovereigns." *Id.* at 1779. The fact of the prosecution implies an assessment of risk by the executive branch on which the courts may rely. "[W]e may assume that by electing to

---

**7.** Although the Patriot Act amended RICO to include precisely the conduct at issue, we noted that "the conduct alleged in *Canada* was also within the scope of RICO's prohibitions," *id.* (citing *Canada*, 268 F.3d at 106–08); in neither case did this preclude application of the rule.

bring this prosecution, the Executive has assessed this prosecution's impact on this Nation's relationship with Canada, and concluded that it poses little danger of causing international friction." *Id.*

Second, the Court found concerns about separation of powers greatly diminished where the government brings a prosecution within the bounds of a statute created by Congress.

> The present prosecution, if authorized by the wire fraud statute, embodies the policy choice of the two political branches of our Government—Congress and the Executive—to free the interstate wires from fraudulent use, irrespective of the object of the fraud. Such a reading of the wire fraud statute gives effect to that considered policy choice.

*Id.* at 1780. Where the two political branches have approved a legal action that may advance the policies of a foreign government, the courts do not overstep their authority by allowing the action to go forward. Thus, the involvement of the United States government was a key factor in determining the outcome of *Pasquantino.*

The present civil lawsuit, on the other hand, is brought by foreign governments, not by the United States. Moreover, the executive branch has given us no signal that it consents to this litigation. *See EC I,* 355 F.3d at 137 (executive branch's failure to intervene in opposition to suit does not constitute an affirmative expression of consent).[8] In short, the factors that led the *Pasquantino* Court to hold the revenue rule inapplicable to § 1343 smuggling prosecutions are missing here.

Contrary to plaintiffs' assertion that *Pasquantino* rejects this Circuit's approach to the revenue rule, *Pasquantino* actually affirms the prior law of this Circuit, under which the revenue rule was held inapplicable to § 1343 smuggling prosecutions. In *United States v. Trapilo,* 130 F.3d 547, 552–53 (2d Cir.1997), we held that the revenue rule is not implicated by a smuggling prosecution under § 1343, because a § 1343 conviction requires a finding that the defendant schemed to defraud, but not a finding that the scheme succeeded. Thus, in § 1343 cases, courts do not actually pass on the validity of the foreign law. *Id.* The reasoning in *Trapilo* was perhaps different from the reasoning in *Pasquantino,* but the rule it established was the rule of *Pasquantino:* wire fraud prosecutions for smuggling are not barred by the revenue rule. Thus, *Pasquantino* did not shift the limits of the revenue rule's protection in this Circuit.

The plaintiffs argue that *Pasquantino* adopts a narrow version of the revenue rule, under which only suits whose "whole object" is the collection of foreign tax revenue are barred. They point to a sentence in *Pasquantino* in which the Supreme Court found that "the link between this prosecution and foreign tax collection is incidental and attenuated at best, making it not plainly one in which 'the whole object of the suit is to collect tax for a foreign revenue.'" 125 S.Ct. at 1777 (quoting *Peter Buchanan Ltd. v. McVey,* 1955 A.C. 516, 529 (Ir.H.Ct.1950), *app. dism'd,* 1955 A.C. 530 (Ir.Sup.Ct.1951)). But the same paragraph also uses the phrases "main object" and "primary ob-

---

**8.** In fact, we note that in *Pasquantino,* as well as in *Canada,* the United States government argued that the revenue rule does not apply to criminal prosecutions, but agreed that the rule applies to civil cases brought by foreign governments involving any direct or indirect attempt to enforce their tax laws. Brief for the United States at 15 n. 4, *Pasquantino v. United States,* —— U.S. ——, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005) (No. 03–725) (citing Brief for the United States at 11–13, *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 537 U.S. 1000, 123 S.Ct. 513, 154 L.Ed.2d 394 (2002) (No. 01–1317)).

ject" to describe the inquiry, *Pasquantino*, 125 S.Ct. at 1777, implying that a suit which had secondary objects irrelevant to revenue collection might still be barred by the rule. We acknowledge that, although it seems reasonable to assume the Supreme Court intended the three formulations to be treated as roughly synonymous, this language in *Pasquantino* is not entirely clear. But the "whole object" of the present suit is to collect tax revenue and the costs associated with its collection. Thus, under any of the available formulations of the revenue rule, plaintiffs' claims are barred.[9]

The plaintiffs argue that the present suit seeks to vindicate an interest of the United States government in the enforcement of its own laws, i.e., RICO, rather than a foreign revenue interest. This was the argument of the dissent in *Canada*. *See* 268 F.3d at 137 (Calabresi, J., dissenting) ("[W]hen American law renders an activity—including the violations of foreign tax laws—an American tort or crime, the issues of whether our foreign policy favors or disfavors the particular form of taxation involved or the choice of items to be taxed must disappear."). Whatever the merits of this argument, *Pasquantino* does not endorse it.

As we held in *Canada*, "[w]hat matters is not the form of the action, but the substance of the claim." *Id.* at 130. Here, the substance of the claim is that the defendants violated foreign tax laws. "When a foreign nation appears as a plaintiff in our courts seeking enforcement of its revenue laws, the judiciary risks being drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government." *Canada*, 268 F.3d at 114. In *Pasquantino*, this concern was alleviated by the direct participation of the political branches in the litigation. *See* 125 S.Ct. at 1779–80. Here we have no such assurance. We therefore see no reason why *Pasquantino*'s analysis should disturb our conclusion that the revenue rule bars civil RICO suits by foreign governments against smugglers.[10] *Pasquantino* casts no doubt on the reasoning or the result of *EC I*.

## CONCLUSION

For the foregoing reasons, our opinion in *EC I* is REINSTATED. The judgment of the district court is AFFIRMED as to the judgments in *European Community v. RJR Nabisco, Inc.*, 355 F.3d 123, and *Department of Amazonas v. Philip Morris Companies*, No. 02–7325, and VACATED

---

**9.** The plaintiffs also argue that *Pasquantino* conflicts with *Canada* because *Canada* cited the small number of treaties in which the United States agreed to enforce foreign tax judgments as evidence of the political branches' "continuing policy preference against enforcing foreign tax laws." *Canada*, 268 F.3d at 118. In *Pasquantino*, the Supreme Court noted that United States tax treaties did not "convince [the Court] that petitioners' scheme falls outside the terms of the wire fraud statute." 125 S.Ct. at 1773 (citing *Canada*, 268 F.3d at 115–119). The Supreme Court did not criticize *Canada* for relying on those treaties as evidence of congressional intent. Also, we note that the existence of those treaties, although it demonstrates that the revenue

rule is consistent with the political branches' continuing policy preferences, hardly formed the basis of the opinion in *Canada*. We therefore decline to interpret the Supreme Court's passing comment as an attack on the reasoning in *Canada*.

**10.** Nor can plaintiffs avoid the revenue rule by adding claims for injunctive relief compelling defendants to obey their tax laws. As we noted in *EC I*, "injunctions would have the effect of extraterritorially enforcing plaintiffs' tax laws just as directly as would their claims for damages." 355 F.3d at 138. *Pasquantino* in no way alters this analysis.

AND REMANDED as to *European Community v. Japan Tobacco, Inc.*, 2002 WL 32443614, for further proceedings consistent with this opinion and our reinstated opinion in *EC I*.