*Doscher v. Sea Port*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2015

(Argued: March 8, 2016    Decided: August 11, 2016)

Docket No. 15-2814

DREW DOSCHER,

*Petitioner-Appellant*,

–v.–

SEA PORT GROUP SECURITIES, LLC, STEPHEN SMITH,
MICHAEL MEAGHER, MICHAEL MEYER, THE SEAPORT
GROUP, LLC, ARMORY ADVISERS, LLC, ARMORY
FUND, LP, and SEAPORT V, LLC,

*Respondents-Appellees*.

Before:

POOLER and WESLEY, *Circuit Judges*, and EATON, *Judge*.*

_____

Appeal from the August 5, 2015 order and August 7, 2015 judgment of the United States District Court for the Southern District of New York (Furman, *J.*). Petitioner-Appellant Drew Doscher appeals from the dismissal of his petition to vacate a final arbitral award under section 10 of the Federal Arbitration Act, 9 U.S.C. § 10 (the "Act"). The District Court concluded that this Court's decision in *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22 (2d Cir. 2000), precluded it from using the so-called "look-through" approach in determining whether federal-question jurisdiction exists over the petition. While the District Court correctly applied *Greenberg*, we conclude that the Supreme Court's subsequent decision in *Vaden v. Discover Bank*, 556 U.S. 49 (2009), casts doubt upon *Greenberg*'s continued vitality. Upon reconsideration of *Greenberg*, therefore, we conclude that the reasoning of *Vaden* and the nature of the Act require overruling *Greenberg*. We therefore hold that district courts may apply a look-through approach to § 10 petitions. We also conclude that allegations that arbitrators disregarded rules of a self-regulatory organization do not allege a manifest disregard of federal law. Accordingly, we **VACATE** the District Court's order and judgment and **REMAND** the case for further proceedings.

_____

_____

* The Honorable Richard K. Eaton of the United States Court of International Trade, sitting by designation.

A. TODD MEROLLA, Merolla & Gold, LLP, Atlanta, GA, *for Petitioner-Appellant*.

RONALD G. BLUM (Benjamin J. Wolfert, *on the brief*), Manatt, Phelps & Phillips, LLP, New York, NY, *for Respondents-Appellees*.

_____

WESLEY, *Circuit Judge*:

This case arises from the dismissal of a petition to vacate an arbitral award pursuant to section 10 of the Federal Arbitration Act (the "FAA" or the "Act"), 9 U.S.C. § 10. It requires us to reconsider the continuing viability of our Court's precedent in *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22 (2d Cir. 2000), in which we held that a district court may exercise federal-question jurisdiction over a § 10 petition only if the petition states a substantial federal question on its face—*i.e.*, a district court may not "look through" the petition to determine if the underlying dispute that was subject to arbitration involved substantial questions of federal law. *Greenberg* premised its conclusion on a now-overruled decision of this Court that rejected a look-through approach as applied to section 4 of the Act, 9 U.S.C. § 4. *See Westmoreland Capital Corp. v. Findlay*, 100 F.3d 263 (2d Cir. 1996), *overruled by Vaden v. Discover Bank*, 556 U.S. 49 (2009).

We would not need to decide whether *Greenberg* remains good law if, as Appellant argues, federal-question jurisdiction exists on the face of the petition because of an arbitration panel's alleged manifest disregard of a self-regulatory organization's internal rule. But because the arbitration panel's conduct implicates no federal law and thus cannot form the basis of jurisdiction, *Greenberg*'s continued viability takes center stage. We conclude that *Greenberg* cannot survive *Vaden*'s later-

3

established precedent; accordingly, we vacate the order and the judgment of the District Court.

## BACKGROUND[1]

In June 2013, Petitioner-Appellant Drew Doscher—the onetime co-head of sales and trading for The Seaport Group, LLC and Sea Port Group Securities, LLC (together, "Seaport")—commenced arbitration against his former employers; both are members of the Financial Industry Regulatory Authority ("FINRA").[2] Doscher also included the individual Respondents-Appellees—the two founders of Seaport and his former co-head of sales and trading—as well as the other three entity Respondents-Appellees. His initial statement of claim against his counterparties alleged breach of contract, retaliatory discharge, and unjust enrichment, but he later amended his statement to add a claim for securities fraud under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange

---

[1] The facts here are drawn from the District Court's August 5, 2015 memorandum opinion and order. *See Doscher v. Sea Port Group Sec., LLC*, No. 15-CV-384 (JMF), 2015 WL 4643159 (S.D.N.Y. Aug. 5, 2015).

[2] FINRA is a "self-regulatory organization" registered under section 15A of the Exchange Act, 15 U.S.C. § 78o-3, and subject to oversight under section 19 of the same act, *id.* § 78s. *See Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569, 571–72, 574 (2d Cir. 2011) (internal quotation marks omitted). FINRA's internal rules require arbitration of disputes between Doscher and Seaport as a "dispute aris[ing] out of the business activities of a member or an associated person" that "is between or among . . . Members and Associated Persons." FINRA Rule 13200; *see also* FINRA Rule 13100(a), (o) (defining "Associated Person" and "Member"). FINRA's rules may be found at http://tinyurl.com/finrarules.

4

Commission ("SEC"), 17 C.F.R. § 240.10b-5. Doscher sought more than $15 million in damages; ultimately, on October 22, 2013, the arbitral panel awarded him almost $2.3 million, with a potential additional commission.

On January 20, 2015, Doscher filed a § 10 petition to vacate and modify in part the award in the United States District Court for the Southern District of New York (Furman, *J.*). His petition identified two grounds for vacatur: (1) the arbitration panel failed to ensure that documentary evidence was fully and timely made available to Doscher, thereby warranting vacatur under § 10(a)(3), and (2) the arbitration panel acted in manifest disregard of FINRA Rule 13505 requiring parties to cooperate in discovery. Doscher asserted that the District Court possessed subject matter jurisdiction because, first, FINRA Rule 13505 was a rule of federal law and the petition thus stated a federal question on its face, and, second, that his section 10(b) claim in the underlying arbitration conferred federal-question jurisdiction. On August 5, 2015, the District Court issued a memorandum opinion and order rejecting both arguments. First, it held that violations of internal FINRA rules do not present questions of federal law, and second, it held that Doscher's reliance on his section 10(b) claim was "squarely foreclosed" by *Greenberg*, which the District Court concluded remained good law. *Doscher*, 2015 WL 4643159, at *2–4. Finding no subject matter jurisdiction, the District Court dismissed the petition in its entirety and entered judgment in Appellees' favor on August 7, 2015.

## DISCUSSION

Both grounds for subject matter jurisdiction asserted by Doscher turn on questions of law, which we review *de novo*. *See Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir. 1998).

5

Doscher's argument that a substantial federal question appears on the face of the petition receives our initial attention; if his contention were correct, we would have no need to address *Greenberg*'s continued vitality.

## I.

As explained in *Greenberg*, federal-question jurisdiction lies on the face of the petition where "the petitioner complains principally and in good faith that the award was rendered in manifest disregard of federal law." *Greenberg*, 220 F.3d at 27; *accord Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 139 (2d Cir. 2002).[3] Implicit in this holding is the requirement that the legal rule that the arbitration panel allegedly manifestly disregarded is in fact a rule of *federal* law.

Doscher argues that the internal rules of self-regulatory organizations ("SROs") such as FINRA are federal law, because those rules are subject to SEC approval, abrogation, or modification, *see* 15 U.S.C. § 78s(b)–(c), and because SROs are obligated both to abide by and to enforce their own internal rules, *see id.* § 78s(g). He specifically alleges that the arbitration panel failed to enforce FINRA Rule 13505, which provides, in full, that "[t]he parties must cooperate to the fullest extent practicable in the exchange of documents and information to expedite the arbitration."

In support of his argument, Doscher relies on a recent decision of our Court, *NASDAQ OMX Group, Inc. v. UBS*

---

[3] After the Supreme Court held that § 10 provides the exclusive grounds for vacatur of an arbitration award, *see Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), our Court held that "manifest disregard of the law" is a "judicial gloss" on § 10 that permits vacatur. *See Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451–52 (2d Cir. 2011) (internal quotation marks omitted).

6

*Securities, LLC,* 770 F.3d 1010 (2d Cir. 2014). In *NASDAQ,* although the plaintiffs alleged four claims arising under state law, "a singular duty underl[ay] all four"—namely, "NASDAQ's duty to operate a fair and orderly market—a duty sourced in the Exchange Act, amplified by SEC regulations, and implemented through SEC-approved NASDAQ rules." *Id.* at 1021. Thus, we concluded, any inquiry into whether this duty was violated—an essential element of the four state-law claims—necessarily raised substantial and disputed questions of federal law. *Id.* at 1023 (applying *Gunn v. Minton*, 133 S. Ct. 1059, 1065 (2013)).

Doscher's case is built on a distinctly different and, unfortunately for him, unstable foundation. As discussed above, the Exchange Act requires FINRA to subject its internal rules to SEC approval, abrogation, or modification. *See* 15 U.S.C. § 78s(b)(1), (c).[4] The Exchange Act also requires FINRA to comply with its own internal rules and to enforce compliance by its members and associated persons. *Id.* § 78s(g)(1)(B). While Doscher must allege that the arbitration panel manifestly disregarded a rule of federal law, federal law imposes obligations only on self-regulatory organizations—not on arbitration panels applying their rules. Moreover, the rule implicated here is one step further removed: it directs "[t]he *parties* [to] cooperate to the fullest extent practicable." FINRA Rule 13505 (emphasis added). Doscher's claim is, in essence, that the Exchange Act requires FINRA to require the arbitration panel to require the parties to cooperate, and the parties did not

---

[4] Internal rules must be approved by the SEC if the rule "is consistent with the requirements of this chapter and the rules and regulations issued under this chapter that are applicable to" the SRO. § 78s(b)(2)(C)(i). The rule is also deemed approved by default if the SEC fails to approve or disapprove the rule within the deadlines provided by the Exchange Act. *See* § 78s(b)(2)(D).

cooperate. The only federal obligation is the one imposed by the Exchange Act on FINRA, and none of FINRA's conduct is implicated by Doscher's petition. Doscher's asserted violation is simply too attenuated to constitute a colorable claim that any obligation or duty of federal law was manifestly disregarded. Thus, this case is wholly unlike *NASDAQ,* in which an obligation imposed by federal law on an SRO—to operate a fair and orderly market—was a necessary element of the state law actions.

Doscher's position is not without some support. He directs our attention to *Sacks v. Dietrich*, 663 F.3d 1065, 1069 (9th Cir. 2011), in which the Ninth Circuit ruled that federal-question jurisdiction extended to claims premised on violations of internal FINRA rules by arbitrators. Specifically, the plaintiff in *Sacks* filed a suit in state court, challenging the arbitrators' decision to disqualify him as a party's representative in a FINRA arbitration, because he had been barred from the securities industry twenty years prior. *Id.* at 1067; *see also* FINRA Rule 13208(c) (precluding persons "currently suspended or barred from the securities industry in any capacity" from representing a party in FINRA arbitration). The defendants removed the case to federal court. The Ninth Circuit concluded that the removal was proper "because the central question of this case [was] whether FINRA rules were violated" and thus "application of federal law [was] necessary to resolve each of the state law theories." *Sacks*, 663 F.3d at 1069.

In reaching this conclusion, the court relied heavily on a prior Ninth Circuit precedent, *Sparta Surgical Corp. v. National Ass'n of Securities Dealers, Inc.*, 159 F.3d 1209 (9th Cir. 1998). In *Sparta*, the plaintiffs had asserted state common-law claims that alleged, as a necessary component of the claims, conduct by the

8

National Association of Securities Dealers ("NASD")[5] that violated its internal rules. The Ninth Circuit concluded that "[b]ecause federal courts are vested by 15 U.S.C. § 78aa with the exclusive jurisdiction over actions brought 'to enforce any liability or duty' created by exchange rules," federal jurisdiction was proper. *Id.* at 1212. Relying on *Sparta*, the *Sacks* court saw no distinction between a case in which the SRO violated its own rules and one in which an arbitrator was charged with the rule violation: the *Sacks* panel chose to ground its decision on the characterization of internal SRO rules as federal law, regardless of the identity of the alleged violator. *Sacks*, 663 F.3d at 1069.

With due respect to our sister circuit, its reasoning is unpersuasive. There is a critical difference between cases like *Sparta* and *NASDAQ* involving allegations that the SRO breached its own internal rules and cases like *Sacks* and Doscher's involving allegations that someone other than the SRO violated the internal rules. In the former, the SRO's conduct may breach § 78s(g)(1), while in the latter, neither the cause of action nor any necessary element of it involves adjudicating any breach of a federal obligation.

More importantly, however, whatever force existed in the Ninth Circuit's conclusion that any violation of internal SRO rules falls categorically within 15 U.S.C. § 78aa's grant of "exclusive [federal] jurisdiction of violations of [Chapter 2B of Title 15] or the rules and regulations thereunder," it is no longer tenable following the Supreme Court's recent decision in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562

---

[5] NASD was the predecessor organization to FINRA. *See Fiero*, 660 F.3d at 571 & n.1.

(2016).[6] In *Manning*, the Supreme Court adopted the Third Circuit's test for determining what actions fall under exclusive federal jurisdiction under § 78aa, laying out an identical inquiry to the familiar "arising under" test for federal-question jurisdiction under 28 U.S.C. § 1331. *Id.* at 1567–68. In doing so, it expressly rejected *Sparta*'s broader interpretation. *See id.* at 1567 & n.1. Applying the same principles as the "arising under"

---

[6] *Sparta*'s interpretation of the scope of § 78aa did not necessarily make sense prior to *Manning* either. Section 19 of the Exchange Act, for example, requires compliance by an SRO with "the provisions of this chapter, the rules and regulations thereunder, *and its own rules*," § 78s(g)(1) (emphasis added). The Act thus clearly distinguishes between "rules and regulations thereunder" and internal SRO rules, and "[g]enerally, identical words used in different parts of the same statute are presumed to have the same meaning," *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006) (alteration and internal quotation marks omitted); *see also Sebelius v. Cloer*, 133 S. Ct. 1886, 1894 (2013) ("We have long held that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration and internal quotation marks omitted)).

Concluding that the Exchange Act's phrase "rules and regulations thereunder" includes internal SRO rules would also have the necessary result under § 78(g)(1) of requiring each individual SRO to comply with the rules of *every other* SRO. This interpretation not only produces absurd results but would turn the requirement of compliance with an SRO's "own rules" in § 78s(g)(1) into surplusage, thus running contrary to two canons of construction at once. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (reiterating the preference for statutory interpretations that do not render terms superfluous); *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (articulating the preference against interpretations producing absurd or plainly unreasonable results).

standard, the Court held that § 78aa applies to two kinds of suits: (1) those in which "federal law creates the cause of action asserted" and (2) "'a special and small category of cases'" that "'necessarily raise[] a stated federal issue, actually disputed and substantial.'" *Manning*, 136 S. Ct. at 1569–70 (quoting *Gunn*, 133 S. Ct. at 1064; *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)). The Court characterized the first category as encompassing those cases "asserting an Exchange Act cause of action"—*i.e.*, "the prototypical way of enforcing an Exchange Act duty." *Id.* at 1569. For the second category, the Court twice framed the inquiry as whether the non-Exchange Act action "necessarily depends on a showing that the *defendant* breached the Exchange Act" or whether the plaintiff must prove "as the cornerstone of his suit, that the *defendant* infringed a requirement of the federal statute." *Id.* (emphases added).[7] As described above, the Exchange Act itself imposes no duty to comply with FINRA rules either on the arbitrators or non-SRO parties to arbitration. An action to vacate an arbitration award on either ground therefore falls into neither of *Manning*'s categories.

Doscher's petition does not present a facial claim of any manifest disregard of federal law. All that remains is to check *Greenberg*'s pulse for vital signs in light of the Supreme Court's decision in *Vaden*.

---

[7] Although it is unnecessary to decide conclusively, we nonetheless note that *Manning*'s second category is identical to the basis asserted for jurisdiction in *NASDAQ. See NASDAQ*, 770 F.3d at 1020. Thus, at least on a facial read of the two cases, we think there is no reason to suspect that *Manning* called *NASDAQ* into question, and we are comfortable relying on *NASDAQ*'s reasoning here.

## II.

It is a longstanding rule of our Circuit that a three-judge panel is bound by a prior panel's decision until it is overruled either by this Court sitting *en banc* or by the Supreme Court. *See United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004); *see also Ingram v. Kumar*, 585 F.2d 566, 568 (2d Cir. 1978). Nonetheless, we have consistently recognized two instances in which a three-judge panel may issue an opinion that overrules Circuit precedent. The first is often called a "mini–*en banc*," in which the panel circulates its opinion among all active judges and receives no objections to its filing. *See, e.g., Shipping Corp. of India Ltd. v. Jaldhi*, 585 F.3d 58, 67 & n.9 (2d Cir. 2009); *see also United States v. Roglieri*, 700 F.2d 883, 887 n.2 (2d Cir. 1983). The second is "where an intervening Supreme Court decision casts doubt on the prior ruling." *E.g., Finkel v. Stratton Corp.*, 962 F.2d 169, 174–75 (2d Cir. 1992); *cf. Boothe v. Hammock*, 605 F.2d 661, 663 (2d Cir. 1979).[8]

To qualify as an intervening decision, the Supreme Court's conclusion in a particular case must have "broke[n] the link . . . on which we premised our [prior] decision," *Finkel*, 962 F.2d at 175, or "undermine[d] [an] assumption" of that decision, *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 274 (2d Cir. 2005). It is not, however, necessary that the Supreme Court have

---

[8] We have not been particularly clear whether this latter situation is merely an application of the rule, recognizing that the Supreme Court may "implicitly" overrule the "rationale" of one of our precedents, *e.g., United States v. Santiago*, 268 F.3d 151, 154 (2d Cir. 2001) (Sotomayor, J.) (internal quotation marks omitted), or whether it constitutes a separate "exception" to the rule, *e.g., Union of Needletrades, Indus. & Textile Emps. v. INS*, 336 F.3d 200, 210 (2d Cir. 2003) (citing *Boothe*, 605 F.2d at 663). Whatever its origins, however, the rules governing the principle's application are well established, as we explain below.

12

"address[ed] the precise issue decided by the panel for this exception to apply." *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010). If a panel concludes that a particular Supreme Court decision does not cast sufficient doubt on our precedent, the precedent continues to be binding. *See, e.g.*, *FDIC v. First Horizon Asset Sec., Inc.*, No. 14-3648, 2016 WL 2909338, at *3 (2d Cir. May 19, 2016); *United States v. Robbins*, 729 F.3d 131, 135–36 (2d Cir. 2013); *European Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 179 (2d Cir. 2005) (Sotomayor, J.). When sufficient doubt exists, however, and the panel must reconsider whether that precedent should continue as the law of the Circuit, it not only applies the conclusions of the intervening Supreme Court case but also employs normal interpretive methods and examines such things as the internal consistency of the statute, statutory purpose and legislative history, analogous statutes, and even changes in the judicial landscape and the conclusions of other Circuits. *See, e.g.*, *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405–08 (2d Cir. 2014); *United States v. Gill*, 748 F.3d 491, 501–04 (2d Cir. 2014); *Sullivan*, 424 F.3d at 274–77; *Union of Needletrades, Indus. & Textile Emps. v. INS*, 336 F.3d 200, 210 (2d Cir. 2003). Even if the effect of a Supreme Court decision is "subtle," it may nonetheless alter the relevant analysis fundamentally enough to require overruling prior, "inconsistent" precedent. *Wojchowski v. Daines*, 498 F.3d 99, 108 (2d Cir. 2007) (alteration and internal quotation marks omitted).

A less-than-stringent application of the standards for overruling prior decisions not only calls into question a panel's respect for its predecessors but also increases uncertainty in the law by revisiting precedent without cause. Nonetheless, a three-judge panel must answer a question squarely presented if no other avenue for resolution of the case exists. *See Sullivan*, 424 F.3d at 274 ("Because the [Supreme] Court's more recent

13

decision . . . entirely undermines [our prior] assumption about the RLA, we must reconsider [prior] conclusions about RLA preemption without rehearing this case en banc.").[9] Doscher has argued to us that *Vaden* displaces *Greenberg*. Finding no other basis for decision in this case, we must therefore evaluate *Greenberg*'s continuing validity.

## A.

Section 4 of the Act provides, in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court *which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties,* for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4 (emphasis added). By contrast, section 10 of the Act provides that "the United States court *in and for the district wherein the award was made* may make an order vacating the award upon the application of any party to the arbitration" if certain grounds for vacatur exist. *Id.* § 10(a) (emphasis added).[10]

---

[9] In addition, this opinion was circulated to all judges of this Court prior to filing, and we received no objection. *See In re Zarnel*, 619 F.3d 156, 168 n.5 (2d Cir. 2010); *United States v. Parkes*, 497 F.3d 220, 230 n.7 (2d Cir. 2007).

[10] Sections 9 and 11 of the Act contain substantially identical language to § 10; all three lack the italicized clause in § 4. *See* 9 U.S.C. §§ 9–11.

14

The critical question before us is whether the textual difference between § 4 and § 10 means that a look-through approach applies only to the former.

*Westmoreland* rejected the look-through approach with respect to § 4 based on the decisions of a number of district courts in our Circuit, as well as the decisions of our sister circuits. *See* 100 F.3d at 267 (citing cases). In chief, *Westmoreland* accepted the reasoning of *Drexel Burnham Lambert, Inc. v. Valenzuela Bock*, 696 F. Supp. 957 (S.D.N.Y. 1988), a decision penned by Judge Leval while still on the district court. *Valenzuela Bock* held, and *Westmoreland* agreed, that the "save for" clause in § 4 constituted a congressional repudiation of the "ouster theory"—an "antiquated common law principle that an agreement to arbitrate would oust the federal courts of jurisdiction." *Westmoreland*, 100 F.3d at 268 (citing *Valenzuela Bock*, 696 F. Supp. at 961–62). Additionally, *Westmoreland* noted that the provisions lacking § 4's unique language "have not been interpreted to confer jurisdiction on the federal courts" and that it "would produce an odd distinction" if "a petition to compel arbitration could be brought in federal court, but a petition under FAA §§ 9 or 10 to confirm or vacate the arbitration award in the same dispute could not." *Id. Westmoreland* again relied on *Valenzuela Bock*'s reasoning:

> This distinction would truly be "bizarre," because "[t]he interest of the federal court in determining whether the arbitration award was entered in manifest disregard of the federal law . . . would seem to be far greater than the federal interest in seeing that the claims could be arbitrated."

*Id.* (alterations in original) (quoting *Valenzuela Bock*, 696 F. Supp. at 963).

15

Four years later, a second panel of this Court was asked to determine whether it possessed federal-question jurisdiction over a § 10 petition. It rejected the look-through approach for such petitions squarely and exclusively on the basis of *Westmoreland*. *See Greenberg*, 220 F.3d at 26. In doing so, it reiterated *Westmoreland*'s reliance on the "ouster theory" explanation and then held that "[t]he holding in *Westmoreland* logically extends to motions to vacate an arbitration award under § 10 of FAA," additionally citing the holdings of two other circuits and two district courts in our Circuit. *Id.* The *Greenberg* panel reasoned:

> As with a motion under § 4, the only federal rights that a motion under § 10 necessarily implicates are those created by the FAA itself, which rights do not give rise to federal question jurisdiction. In both contexts, there is no necessary link between the requested relief and the character of the underlying dispute. For example, a petition to compel arbitration because the dispute falls within the scope of an arbitration clause, or to vacate an award because the arbitrators exceeded their powers under that clause, will turn on the interpretation of the clause, regardless of whether the actual dispute implicates any federal laws.

*Id.* It went on to conclude, however, that if a petition raised an argument "that the award was rendered in manifest disregard of federal law, a substantial federal question is presented and the federal courts have jurisdiction to entertain the petition." *Id.* at 27.

Nine years after *Greenberg*, the Supreme Court expressly overruled *Westmoreland* in its *Vaden* decision. It began by reaffirming its longstanding conclusion that the Act "is something of an anomaly in the realm of federal legislation: It bestows no federal jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute." *Vaden*, 556 U.S. at 59 (alterations and internal quotation marks omitted). Next, it laid out the general rules of federal-question jurisdiction under 28 U.S.C. § 1331—the "independent jurisdictional basis" relied upon by the petitioner. *Id.* The Court then announced that "[a] federal court may 'look through' a § 4 petition to determine whether it is predicated on an action that 'arises under' federal law." *Id.* at 62.

This rule was, the Court held, driven by the text of § 4:

> The phrase "save for [the arbitration] agreement" indicates that the district court should assume the absence of the arbitration agreement and determine whether it "would have jurisdiction under title 28" without it. Jurisdiction over what? The text of § 4 refers us to "the controversy between the parties[,]" . . . [which is] most straightforwardly read to mean the "substantive conflict between the parties."

*Id.* (first alteration in original) (citations omitted) (quoting § 4). The Court noted that a majority of the federal courts of appeals had rejected such an approach but concluded that the "ouster theory" explanation on which most relied was not persuasive: if any lingering ouster doctrine existed, section 2 of the Act, which declared all arbitration agreements valid and enforceable, "directly attended to the problem." *Id.* at 64. The Court then

17

noted that rejecting the look-through approach had "curious practical consequences":

> It would permit a federal court to entertain a § 4 petition only when a federal-question suit is already before the court, when the parties satisfy the requirements for diversity-of-citizenship jurisdiction, or when the dispute over arbitrability involves a maritime contract.

*Id.* at 65 (citing *Westmoreland*, 100 F.3d at 268–69). In other words, if a federal-question suit was filed in federal court, the court could compel arbitration—but if the suit had not already been filed, it could not. *Id.* This approach "'create[d] a totally artificial distinction' based on whether a dispute is subject to pending federal litigation." *Id.* (quoting 1 I. MACNEIL, R. SPEIDEL & T. STIPANOWICH, FEDERAL ARBITRATION LAW § 9.2.3.3, at 9:21 (1995)).

**B.**

We think it clear that *Vaden* satisfies the standard for an intervening Supreme Court decision that "casts doubt on the prior ruling" in *Greenberg*. *Finkel*, 962 F.2d at 175. The only rationale *Greenberg* employed to reach its conclusion was "logically extend[ing]" *Westmoreland*'s rejection of the look-through approach to § 10. *Greenberg*, 220 F.3d at 26. Put another way, if one were to excise all reliance upon *Westmoreland* from *Greenberg*, we would be left exclusively with a question and an answer but no intervening reasoning. The necessary conclusion is that *Vaden* both "broke the link," *Finkel*, 962 F.2d at 175, and "undermine[d] [the] assumption," *Sullivan*, 424 F.3d at 274, underlying *Greenberg*'s conclusion that the look-through

18

approach was inapplicable to § 10.[11] Of course, the inquiry does not end here: our task now is to determine whether *Greenberg*'s result is "inconsistent" with *Vaden* and the post-*Vaden* statutory context of the Act. *E.g.*, *Wojchowski*, 498 F.3d at 108; *see also Lotes Co.*, 753 F.3d at 406.

*Vaden* provides us with three critical pieces of guidance. First, it reiterated the longstanding rule that the Act's provisions do not bestow or enlarge subject matter jurisdiction. Second, it relied heavily upon the text of, and interaction between, the relevant provisions of the Act. Third, it identified the practical consequences resulting from the interpretive choices. The application of these three guideposts, however, is significantly more complicated.

Beginning with the most obvious point, § 10 lacks the textual "save for" clause contained in § 4. This distinction is not to be taken lightly, particularly in the face of the Supreme Court's statement that "[t]he text of § 4 drives our conclusion" adopting the look-through approach. *Vaden*, 556 U.S. at 62.[12] In

---

[11] In fact, two non-precedential decisions of our Court have suggested—if not directly stated—that *Vaden* may now permit a look-through approach in the § 10 context. *See Giusti v. Morgan Stanley Smith Barney, LLC*, 581 F. App'x 34, 35 (2d Cir. 2014) (summary order); *Bittner v. RBC Capital Mkts.*, 331 F. App'x 869, 871 (2d Cir. 2009) (summary order). No other Circuit has discussed *Vaden*'s applicability outside of the § 4 context, though we note that a recent decision of the Third Circuit applied the look-through approach, without analysis, to a § 10 petition in which the underlying claims were, as here, based on securities fraud under section 10(b). *See Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 147 n.5 (3d Cir. 2015).

[12] It is primarily for this reason that several district courts have declined to apply *Vaden* to the Act's provisions other than § 4. *See Doscher*, 2015 WL 4643159, at *4; *Trs. of Local Union No. 580 v. Gen. Fence*

19

construing § 10, however, we must also keep in mind "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citation omitted); *accord Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) ("[T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute."). We think *Vaden*'s other two guiding principles counsel against a too-hasty reliance on the absence of the "save for" clause. Perhaps in an ordinary case, this absence would end our inquiry—but the Act's anomalous characteristics warrant, we think, a more careful examination. We focus first on the jurisdictional context of *Vaden* and this case and second on the practical consequences of both interpretations.

---

*Corp.*, No. 13-CV-6006, 2014 WL 1800428, at *9–11 (E.D.N.Y. May 5, 2014); *Crews v. S & S Serv. Ctr. Inc.*, 848 F. Supp. 2d 595, 599 (E.D. Va. 2012); *Francis v. Landstar Sys. Holdings, Inc.*, No. 3:09-CV-328-J-32, 2009 WL 4350250, at *4 (M.D. Fla. Nov. 25, 2009). This was also the conclusion reached by the United States District Court for the Eastern District of Pennsylvania, *see Goldman v. Citigroup Global Mkts. Inc.*, No. 12-4469, 2015 WL 2377962, at *3 (E.D. Pa. May 19, 2015) (citing *Greenberg*); *Royal Bank Am. v. Kirkpatrick*, Nos. 11-1058, 11-1112, 2011 WL 4528349, at *3 n.5 (E.D. Pa. Sept. 30, 2011), but these decisions may have been implicitly overruled by the Third Circuit decision discussed *supra* at note 11. By contrast, a few district courts within our Circuit have applied *Vaden* outside of § 4 petitions. *See Santos v. Gen. Elec. Co.*, No. 10 Civ. 6948, 2011 WL 5563544, at *6 (S.D.N.Y. Sept. 28, 2011) (report and recommendation) (§ 10 petition to vacate), *adopted in full by* 2011 WL 5563536 (S.D.N.Y. Nov. 15, 2011); *In re September 11 Litig.*, 765 F. Supp. 2d 587, 591 (S.D.N.Y. 2011) (§ 3 petition to stay); *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010) (§ 3 petition to stay); *see also Harris v. Sycuan Band of Diegueno Mission Indians*, No. 08-cv-2111, 2009 WL 5184077, at *4 (S.D. Cal. Dec. 18, 2009).

*Vaden* repeated the Supreme Court's longstanding conclusion that the Act "bestows no federal jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute." 556 U.S. at 59 (alterations and internal quotation marks omitted); *see also id.* at 79 (Roberts, C.J., concurring in part and dissenting in part) (explaining that the Act "enlarg[es] the range of remedies available in the federal courts[,] . . . not extend[s] their jurisdiction" (second and third alterations in original)). The "independent jurisdictional basis" in *Vaden*, like this case, was federal-question jurisdiction deriving from § 1331. *Id.* at 59–60 (majority opinion). After laying out the contours of federal-question jurisdiction, the Court concluded that the "dispute" giving rise to § 1331 jurisdiction was the "substantive conflict between the parties." *Id.* at 63 (internal quotation marks omitted). Although the Court was unanimous on these points—and on the applicability of the look-through approach—it was divided on how to define the substantive controversy.[13] Despite this disagreement over the scope of the dispute, all nine Justices agreed that "the basic rules of federal-court jurisdiction . . . must

---

[13] The five-Justice majority concluded that the substantive dispute was the recovery of past-due charges by a card-issuing bank, and the cardholders' counterclaims alleging that the charges were preempted by the Federal Deposit Insurance Act could not, under the well-pleaded complaint rule, constitute the required federal question. *Id.* at 66–67 (citing *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826 (2002)). By contrast, the four-Justice minority concluded that the dispute asserted in the § 4 petition exclusively related to the legality under federal law of the bank's charging of fees, and the filing of a state complaint on a related issue did not affect jurisdiction over this discrete dispute. *Id.* at 75–77 (Roberts, C.J., concurring in part and dissenting in part).

21

be followed under § 4." *Id.* at 79 (Roberts, C.J., concurring in part and dissenting in part).

The only reasonable reading of *Vaden*'s jurisdictional analysis thus makes clear two conclusions. First, the district court possessed jurisdiction only by operation of § 1331. Second, the federal question required by § 1331 arose from the underlying dispute, not the face of the petition. These conclusions, however, pose a challenge to the proposition that no look-through approach is appropriate in § 10 petitions, based solely on the statutory text.

Pre-*Vaden*, rejecting the look-through approach with respect to all of the Act's provisions made sense, because a federal court simply compared its jurisdictional statutes to the face of the petition. *See Greenberg*, 220 F.3d at 26 (holding that, in both § 4 and § 10, "the only federal rights . . . necessarily implicate[d] are those created by the FAA itself, which rights do not give rise to federal question jurisdiction"); *Westmoreland*, 100 F.3d at 267–68 (assuming no look-through approach would apply to §§ 9 and 10). Under such a construction, for example, whether an action under the Act presented a substantial federal question sufficient to confer jurisdiction under § 1331 always depended on whether the face of the petition met the standards of federal-question jurisdiction.[14] In essence, the "well-pleaded

---

[14] Although *Greenberg* stated that "[j]urisdiction would plainly lie if, among other things, . . . the claim arose in admiralty," 220 F.3d at 25, this conclusion is less plain in the § 10 context than § 4. If jurisdiction must lie on the face of the petition, the nature of the underlying claim—whether arising under admiralty or federal law—would seem to be irrelevant. But if the nature of the underlying claim is relevant in admiralty, there is no reason—logical or textual—to distinguish between those claims and federal-question claims. The answer with respect to § 4 may lie in the fact that the enforcement of any maritime

complaint" for our jurisdictional inquiries was the petition, regardless of which particular remedy under the Act the petitioner sought. Post-*Vaden*, however, that consistency has been called into question. If we assume that § 4's unique textual clause is dispositive regarding jurisdiction, then, for most of the Act's provisions, federal-question jurisdiction under § 1331 lies (or not) on the face of the petition. In other words, the "ordinary" § 1331 inquiry—*i.e.*, the one conducted absent any special textual clause—requires examining the face of the petition. For § 4 petitions, however, a court's federal-question jurisdiction lies (or not) on the basis of the underlying substantive dispute.

The inconsistency here is evident: if "§ 4 of the FAA does not enlarge federal-court jurisdiction," *e.g.*, *Vaden*, 556 U.S. at 66, how can a federal court's jurisdiction under the *same* jurisdictional statute *differ* between § 4 and all other remedies under the Act? Post-*Vaden*, there is no question that a federal court's § 1331 jurisdiction extends to § 4 petitions that it would have been unable to entertain applying a face-of-the-petition approach. A district court's jurisdiction over disputes in which a party seeks a § 4 remedy is, therefore, broader than its jurisdiction over disputes in which a party seeks one of the other remedies provided by the Act.[15] Put differently, the necessary

contract provision may be brought in federal court, *see* 28 U.S.C. § 1333, and thus, a petition to compel arbitration pursuant to a contractual provision is essentially identical to such an enforcement action. But with respect to § 10 cases, the federal court is not enforcing the contract but applying a federal remedy, and it is hard to see why the nature of the underlying dispute, absent a look-through approach, changes between admiralty and a federal question.

[15] A possible counterargument would say that § 4 does not actually enlarge federal-question jurisdiction under § 1331, it merely applies

result of limiting the look-through approach solely to § 4 petitions is to conclude that the same dispute between the parties would be sufficient to confer § 1331 jurisdiction for the purposes of § 4 petitions but insufficient to confer § 1331 jurisdiction for the purposes of any of the Act's other remedies. That is simply not logically possible without construing § 4 to expand federal jurisdiction—a conclusion the Supreme Court has expressly forbidden us to draw.

Thus, there is some tension between two controlling principles in *Vaden*: the first emphasizing § 4's text in concluding that a court has federal-question jurisdiction over § 4 petitions based on the underlying substantive dispute, *see* 556 U.S. at 62, and the second emphasizing that the provisions of the Act do not affect a federal court's jurisdiction, *see id.* at 59, 66 ("[Section] 4 of the FAA *does not enlarge* federal-court jurisdiction . . . ." (emphasis added)).[16] If we apply the first principle to conclude

those rules to one dispute, instead of another. We think this argument is a distinction without a difference. While the standards for *pleading* jurisdiction may remain the same, construing § 4—but not § 10—to reach the substantive "dispute" for purposes of ascertaining § 1331 jurisdiction is functionally identical to extending § 1331's reach over the class of disputes over which it has cognizance. A court's "jurisdiction"—also called its competence—is its "power to decide a case or issue a decree." *Jurisdiction*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 714 (1838) ("Jurisdiction is the power to hear and determine the subject matter in controversy between parties to a suit; to adjudicate or exercise any judicial power over them."). Thus, a statute that permits—even requires—a court to hear more cases through one jurisdictional inquiry than through another is the epitome of an expansion of that court's jurisdiction.

[16] *See also Vaden*, 556 U.S. at 79 (Roberts, C.J., concurring in part and dissenting in part) ("To the extent § 4 brings some issues into federal

that the absence of the "save for" clause in § 10 requires us to maintain the rule of *Greenberg*, we have, in essence, converted § 4's "save for" clause into an expansion of jurisdiction—which violates the second principle. The only way to avoid this contradictory result is to reject the premise that produced it—*i.e.*, to conclude that the "ordinary" jurisdictional inquiry under § 1331 looks to the underlying substantive dispute with respect to all remedies under the Act, not just § 4.[17]

This tension is further resolved when we examine the nature and function of the "save for" clause in § 4 and the language of the Act's other remedies. To some degree, each of the Act's sections contains some language identifying which courts are authorized to issue which remedies. The most consistent statutory interpretation is to read the "save for" clause as defining the availability of the *remedy*, rather than a court's jurisdiction. Because Congress intended to ensure the broadest availability possible for compulsion of arbitration, § 4 authorizes it in the context of every dispute over which Title 28 confers jurisdiction. The lack of the "save for" clause and the presence of other text narrowing the availability of the remedies in the Act's

---

court in a particular case that may not be brought in through other procedural mechanisms, it does so by enlarging the range of remedies available in the federal courts, not extending their jurisdiction." (alterations and internal quotation marks omitted)); *Hall St. Assocs.*, 552 U.S. at 581 ("As for jurisdiction over controversies touching arbitration, *the Act does nothing . . . .*" (emphasis added)).

[17] This is effectively an argument *reductio ad absurdum*, demonstrating that the result of rejecting the look-through approach is incompatible with a controlling Supreme Court rule. *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 316–17 (2009) (articulating an example of such an argument); *see generally Reductio ad absurdum*, BLACK'S LAW DICTIONARY (10th ed. 2014).

other sections similarly authorize particular remedies to issue in particular courts to serve important congressional interests. Specifically, the Act's other sections largely ground their authorizing language by reference to geography, not the jurisdiction of the issuing court.

For example, the remedy permitting a federal court to compel the attendance of witnesses limits its authorization to "the United States district court for the district in which such arbitrators, or a majority of them, are sitting." 9 U.S.C. § 7.[18] Section 9 uses the same geographical hook, only linked to the district "within which such award was made" and also expressly establishes personal jurisdiction over the parties; §§ 10–11 are similarly geographically connected to the location of the arbitration. The identification of district courts by geography in §§ 7 and 9–11 performs functions more analogous to venue or personal jurisdiction than to subject matter jurisdiction.[19] These sections signal nothing about jurisdiction, suggesting— consistent with *Vaden*—that they do not affect the ordinary jurisdictional inquiry, which is focused on the underlying dispute. There is thus no reason to construe the "save for"

---

[18] This geographical limitation would have made particular sense at the time of the Act's passing. Prior to the 2013 amendments to the Federal Rules of Civil Procedure, a federal district court's subpoena power was generally limited to within the district or within 100 miles of the place of compliance. *See* Fed. R. Civ. P. 45(b)(2) (2007) (amended 2013).

[19] One remedial provision contains *no* identifiers as to a particular court's jurisdiction and simply refers to "the court." 9 U.S.C. § 5. However, in context, this omission also makes sense: § 5 operates as a kind of "add-on" remedy to a § 4 petition to compel arbitration and merely provides default rules for appointing an arbitrator in the event an arbitration agreement is silent.

clause—or its absence from the other remedies—as governing the predicate question of whether a federal court possesses jurisdiction over the dispute at all.[20] Construing the language of these sections as authorizing the availability of the remedies, rather than controlling jurisdiction over the dispute, is therefore a more consistent interpretation of the statute as a whole, *see King*, 502 U.S. at 221 ("[A] statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." (citation omitted))—not to mention being in full accordance with the Supreme Court's characterization of the Act as having a "nonjurisdictional cast," *Vaden*, 556 U.S. at 59; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983).

It is worth pausing briefly to consider the purposes for which Congress passed the Act. The Supreme Court has repeatedly stated that the Act, particularly § 2, "is a congressional declaration of a liberal federal policy favoring arbitration agreements" whose effect "is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24. The first two sections of the Act make clear its intent to reach maritime contracts "which, if the subject of controversy, would be embraced within admiralty jurisdiction" and contracts "evidencing a transaction involving" interstate or foreign commerce, with limited exceptions. 9 U.S.C.

---

[20] That is not to say § 4's "save for" clause had no role at all in *Vaden*'s jurisdictional analysis. If anything, it indicated that Congress understood and intended for § 1331 jurisdiction to be considered on the basis of the underlying dispute. But there is also no indication that Congress intended something *else* to govern jurisdiction in petitions under the rest of the Act, and—to the contrary—Supreme Court precedent precludes us from so holding.

27

§§ 1–2. Congress's ability to legislate substantive rules in these areas derives from "'the incontestable federal foundations of control over interstate commerce and over admiralty.'" *Southland Corp. v. Keating*, 465 U.S. 1, 11 (1984) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 405 (1967)). Of course, if Congress cared only about enforcing arbitration or its results, it could have ended the Act after § 9. Instead, it also provided remedies of vacatur and modification in §§ 10 and 11, albeit on exclusive and narrow grounds sounding in basic fairness and due process—a fact which, the Supreme Court has said, suggests Congress intended to "substantiat[e] a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).

A construction of the Act's provisions as lacking jurisdictional impact is not only consistent with but also well suited to these congressional purposes. Under this approach, if a federal court would possess federal-question jurisdiction over the dispute when pleaded in a complaint, the federal courts are also able to enforce Congress's narrow and defined remedies in the same controversy. The Act thus favors arbitration by constraining the role of the federal courts where arbitration agreements exist, without displacing their ability to enforce the remedies Congress created in disputes in which they would otherwise be the determinative forum. *See Moses H. Cone*, 460 U.S. at 25 n.32 ("[A]lthough enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate."). The authorizing language of the Act with respect to particular remedies maps onto congressional interests well: the remedy of compulsion may be obtained in "any United States district court" possessing subject matter jurisdiction, § 4,

but where the federal courts must engage with an ongoing or concluded arbitration, a geographical nexus is required, *see* §§ 7, 9–11.

Finally, we note that applying a look-through approach to the entire Act also prevents absurd and illogical discrepancies, the final animating principle we identified in *Vaden*. As detailed above, absurd or bizarre inconsistencies in jurisdiction among the Act's provisions were a central concern in both our prior decisions. *See Greenberg*, 220 F.3d at 26; *Westmoreland*, 100 F.3d at 268; *see also Valenzuela Bock*, 696 F. Supp. at 963. *Vaden*'s discussion of the practical consequences confirms that our desire to achieve consistent results was not misplaced, even if the Court disagreed with our interpretation of § 4. *See Vaden*, 556 U.S. at 65. The *Vaden* Court identified a principal "curious practical consequence[]": that a face-of-the-petition "approach would not accommodate a § 4 petitioner who *could* file a federal-question suit in (or remove such a suit to) federal court, but who has not done so." 556 U.S. at 65. Yet the same kind of absurd result would occur here if we reject a look-through approach for § 10.

We have just recently held that § 3's mandatory "shall" language requires a federal court to stay, rather than dismiss, a case if it is referred to arbitration and a stay is requested by a party. *See Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). If such a case were stayed, it could provide, as *Vaden* describes, an independent jurisdictional basis sufficient to permit the federal court to entertain, for example, petitions under §§ 7 and 9–11. *See* 556 U.S. at 65. But absent a look-through approach, no jurisdiction would exist over these petitions if filed as freestanding petitions in the same court, involving the same parties, and concerning the same underlying controversy. This result is the same "'totally artificial distinction'" on the basis of

29

pending federal action that *Vaden* rejected. *Id.* (quoting 1 MACNEIL § 9.2.3.3, p. 9:21).[21]

Likewise, there is a certain absurdity to an interpretation that permits parties to file motions to compel arbitration in any case where the underlying dispute raises a federal question but precludes them from seeking the same federal court's aid under the Act's other remedial provisions related to the same dispute. Our sister circuit has posited an argument why there may be a disparity between congressional interests in § 4 and in § 10— specifically, that "[t]he central federal interest was enforcement of agreements to arbitrate, not review of arbitration decisions" and therefore "once the arbitration agreement is enforced, there exists no compelling need for the federal courts to be involved." *Minor v. Prudential Sec., Inc.*, 94 F.3d 1103, 1107 (7th Cir. 1996).

If enforcement were Congress's only goal, however, it would have had no need to pass §§ 10 or 11 at all. Merely enacting §§ 2 and 3—declaring arbitration agreements enforceable and providing for a stay and referral to arbitration of disputes in federal court governed by such an agreement— would suffice to ensure that federal courts did not sidestep arbitration agreements. *See Hall St. Assocs.*, 552 U.S. at 581–82; *Southland*, 465 U.S. at 13–14. The fact that Congress decided to enact substantive rules governing vacatur and modification

---

[21] Like we do here, the United States District Court for the Eastern District of Virginia expressly noted this discrepancy and identified it as the same artificial distinction rejected in *Vaden*. *See Crews*, 848 F. Supp. 2d at 600. Nonetheless, the district court concluded that such a result was "necessitated by the fact that § 10 does not have § 4's unique jurisdictional hook." *Id.* But, as we noted *supra*, characterizing § 4's text as a jurisdictional hook does precisely what the other principle of *Vaden* prohibits: it treats § 4 as "enlarg[ing] federal-question jurisdiction," 556 U.S. at 66.

makes as clear as one can imagine that Congress intended a substantive—albeit limited—review of certain arbitration awards. *See Hall St. Assocs.*, 552 U.S. at 588. Considering that Congress *did* authorize freestanding petitions to compel arbitration, compel witness attendance, and confirm, vacate, or modify awards, neither *Minor* nor the parties give us any reason why Congress would create a set of remedies yet make some more enforceable than others. *See Moses H. Cone*, 460 U.S. at 25 n.32 (explaining that the Act as a whole "represents federal policy to be vindicated by the federal courts where otherwise appropriate").

The bizarre jurisdictional tangle resulting from a look-through approach to § 4 and a face-of-the-petition approach to the other remedies will produce the exact opposite of the Act's goals. Intelligent practitioners who wish to preserve access to federal courts for later disputes over arbitrators, subpoenas, or final awards will attempt to "lock in" jurisdiction by filing a federal suit first, followed by motions to compel and a stay of proceedings. In other words, it will increase the number of parties "seeking federal adjudication of the very questions [they] want[] to arbitrate rather than litigate"—again, the same perverse incentive and procedural incongruity identified by the *Vaden* Court. 556 U.S. at 65. Construing the Act in a way that encourages the protective filing of federal suits would be the height of absurdity in light of Congress's desire to cabin federal involvement in disputes subject to arbitration—before, during, and after the proceeding. *See Hall St. Assocs.*, 552 U.S. at 588; *Moses H. Cone*, 460 U.S. at 25 n.32.

Finally, we note that, in a twist of irony, a post-*Vaden* conclusion that § 10 requires a federal question on the face of the petition seems oddly to mimic the kind of "ouster" that concerned the *Westmoreland* and *Greenberg* panels and, to a lesser

31

degree, the *Vaden* Court. In other words, if the substantive dispute between the parties is otherwise cognizable before a federal district court, the limitation to the face of the petition seems to restrict the federal courts not on the basis of principles like res judicata or enforceability of arbitration agreements—which are rules of decision—but on the basis of a lack of jurisdiction. Thus, federal courts have been "ousted" of jurisdiction over a substantive dispute between the parties that they would otherwise be empowered under § 1331 to hear, merely because of the presence of an arbitration agreement. By contrast, if we conclude that federal-question jurisdiction arises from the underlying dispute, the arbitration agreement limits the remedies a federal court may employ but does not affect the court's jurisdiction. This result seems to us the more internally consistent approach, given the current state of Supreme Court precedent.

Returning to where we began, we have confronted the difficult task of reconciling the guiding principles that the Supreme Court has handed down—principles which are admittedly in some tension. To read *Vaden*'s text-driven analysis as a jurisdictional inquiry would, on the surface, lead us to reject the look-through approach. But that result would require us, as a matter of internal consistency, to conclude that § 4 did exactly what the Supreme Court says it does not do: enlarge a federal court's jurisdiction. Further, it would produce anomalous discrepancies in the administration of the Act that both we and the Supreme Court have consistently rejected as impermissible results. We think the only way to reconcile this tension is to adopt the following principles:

*First*, the existence of federal-question jurisdiction over an FAA petition turns on whether the district court would possess

jurisdiction over the underlying dispute under the standards of § 1331;

*Second*, the "save for" clause in § 4 evinces congressional authorization for the remedy of compulsion of arbitration in any district court with jurisdiction; and

*Third*, the Act's other sections similarly authorize particular courts with jurisdiction to issue particular remedies but do not affect the jurisdictional inquiry.

Having conducted this analysis, we must now conclude that *Vaden*, as an intervening Supreme Court decision, has rendered *Greenberg*'s result fundamentally inconsistent with the Act's statutory context and judicial interpretations. We are therefore obliged to overrule it and adopt the rule that a federal district court faced with a § 10 petition may "look through" the petition to the underlying dispute, applying to it the ordinary rules of federal-question jurisdiction and the principles laid out by the majority in *Vaden*. Because the District Court concluded below that a look-through approach was foreclosed by *Greenberg*, it did not conduct an analysis of the underlying dispute. We think the proper disposition is therefore to vacate the order and the judgment and remand for consideration of that question in the first instance. *See Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000).

## CONCLUSION

In summary, we reject Doscher's argument that his § 10 petition alleges, on its face, a manifest disregard of federal law, because the petition does not necessarily present a substantial question of any violation of a federal duty or obligation. Thus, squarely faced with the question of *Greenberg*'s continuing validity, we conclude that *Vaden* not only cast doubt on our precedent but rendered its holding fundamentally inconsistent

33

with the Supreme Court's analysis of jurisdictional inquiries under the Act. Accordingly, we overrule *Greenberg* and conclude that federal courts may "look through" § 10 petitions, applying the ordinary principles of federal-question jurisdiction to the underlying dispute as defined by *Vaden*. The order and the judgment of the District Court are **VACATED**, and the case is **REMANDED** for further proceedings consistent with this opinion.